**SUBMISSION OF INTERROGATORIES ON SENATE BILL 93–74.**

**No. 93SA68.**

Supreme Court of Colorado,
En Banc.

May 6, 1993.

**2**

David W. Broadwell, Colorado Municipal League, Thomas J. Lyons, Colorado Coun-

ties, Inc., J. Evan Goulding, Sp. Dist. Ass'n of Colorado, Denver, for Colorado Mun. League, Colorado Counties, Inc. and Sp. Dist. Ass'n of Colorado.

Williams, Youle & Koenigs, P.C., Michael A. Williams, Brian G. Eberle, Denver, for Colorado Ltd. Gaming Control Com'n.

Burns, Wall, Smith and Mueller, P.C., Richard W. Daily, Denver, for Citizens for Great Outdoors Colorado, Inc.

Kathleen C. Zimmerman, Roger Flynn, Boulder, for Colorado Environmental Coalition, Inc. and Colorado Wildlife Federation, Inc.

Mark Hughes, Denver, for Sierra Club, Inc.

Margaret E. Porfido, Kenneth L. Salazar, Denver, for the Honorable Roy Romer, Governor of Colorado.

Douglas G. Brown, Rebecca C. Lennahan, Sharon L. Eubanks, Denver, for the Colorado General Assembly.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Merrill Shields, Deputy Atty. Gen., Regulatory Law Section, Denver.

Douglas Bruce, pro se.

Petrock & Fendel, P.C., James J. Petrock, Frederick A. Fendel, III, Denver, for Board of County Com'rs for the County of Gilpin.

Justice ERICKSON delivered the Opinion of the Court.

The General Assembly of the State of Colorado, by joint resolution, has submitted five interrogatories to this court pursuant to article VI, section 3 of the Colorado Constitution requesting our opinion on constitutional issues regarding Senate Bill 93–74. By order dated March 25, 1993, we agreed to answer Interrogatories Nos. 2 and 5, and declined to answer Interrogatories Nos. 1, 3, and 4.[1] We now determine

---

1. The General Assembly's interrogatories requested this court's opinion on the following questions:

    1. Can special purpose authorities, as defined in section 24–77–102(15), Colorado Revised Statutes, be excluded from state fiscal year spending, as used in section 20(7)(a) of article X of the state constitution?

    2. Are any lottery proceeds dedicated pursuant to the provisions of article XXVII of the

that the answer to Interrogatory No. 2 is "Yes," and the answer to Interrogatory No. 5 is "No."

## I

Article VI, section 3 of the Colorado Constitution provides that "[t]he supreme court shall give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives...." In order for the Colorado Supreme Court to answer interrogatories propounded by the General Assembly on legislative questions pursuant to article VI, section 3, the interrogatories "must be connected with pending legislation, and relate either to the constitutionality thereof, or to matters connected therewith pertaining to purely public rights." *In re Interrogatories of the House*, 62 Colo. 188, 189–90, 162 P. 1144, 1144 (1917).

Senate Bill 93–74 (S.B. 93–74) was introduced in the senate during the current regular session, and the rerevised version of S.B. 93–74 was passed by the house on February 10, 1993. The bill now awaits final action by the senate which has not yet passed the most recent version. Therefore, S.B. 93–74 is "pending legislation" before the senate. *In re Interrogatories of the Governor*, 195 Colo. 198, 215, 578 P.2d 200, 212 (1978) (Erickson, J., concurring in part and dissenting in part). Moreover, Interrogatories Nos. 2 and 5 "relate either to the constitutionality [of S.B. 93–74], or to matters connected therewith pertaining to purely public rights." *In re Interrogatories of the House*, 62 Colo. at 189–90, 162 P. at 1144.

Having determined that Interrogatories Nos. 2 and 5 were sufficiently important and proper, we agreed to exercise our original jurisdiction to answer these two interrogatories. *See In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S–1005*, 814 P.2d 875, 878 (Colo.1991); *In re House Bill No. 1353*, 738 P.2d 371, 372 (Colo.1987); *In re Interrogatories by the Governor as to Senate Bill No. 26*, 116 Colo. 318, 319, 180 P.2d 1018, 1019 (1947). We solicited briefs concerning Interrogatories Nos. 2 and 5 from all interested persons. The General Assembly, the Governor of Colorado, the Attorney General of Colorado, Citizens for Great Outdoors Colorado, Inc., and the Colorado Limited Gaming Control Commission, among others, have filed briefs as amici curiae. Oral argument on the interrogatories was held on April 19, 1993. We have considered all of the briefs and the argument of amici in answering the General Assembly's interrogatories. Before addressing the interrogatories, we briefly consider the relevant constitutional provisions.

state constitution, which was also approved at the 1992 general election, subject to the limitation on state fiscal year spending set forth in section 20(7)(a) of article X of the state constitution?

3. Is it constitutional to define the term "grant", as provided in section 24–77–102(7), Colorado Revised Statutes, to include only direct cash subsidies or other direct contributions of moneys for purposes of section 20(2)(d) of article X of the state constitution, and section 24–77–102(3), Colorado Revised Statutes, while excluding any indirect benefits, such as revenues not expended by an enterprise due to sales tax exemptions?

4. With regard to section 20(9) of article X, which allows a local district to reduce or end its subsidy to "any program delegated to it by the general assembly for administration":

a. Is a program which is one of the inherent powers, duties, or functions of a county officer whose office is created by the state constitution, such as the county treasurer or the county sheriff, a "program delegated ... by the general assembly"?

b. Is a program required by the state constitution to be administered by a local district, such as maintenance of the state court system or equalization of property taxes, a "program delegated ... by the general assembly"?

c. Is a program which the general assembly requires a local district to fund but which is operated by an agency or office not under the jurisdiction of the local district, such as the office of district attorney, a program delegated to the funding local district?

d. Is a program for which a local district makes the major policy determinations a "program delegated ... for administration"?

5. Can the General Assembly enact limitations on revenues collected by the limited gaming control commission, created in section 9(2) of article XVIII of the state constitution, in order to comply with the limitation on state fiscal year spending set forth in section 20(7)(a) of article X of the state constitution?

## Amendment 1

Article X, section 20, of the Colorado Constitution (Amendment 1) was an initiated constitutional amendment approved by the voters at the 1992 general election by a vote of 812,308 to 700,906. Amendment 1 was described as the Taxpayer's Bill of Rights, "TABOR." The Attorney General points out that "the principal purpose of TABOR, as judged by the express language approved by the voters, is to require that the voters decide for themselves the necessity for the imposition of new tax burdens, rather than delegating that decision to State and local legislatures as in the past." As presented to the electorate, it was designed to protect citizens from unwarranted tax increases.

Thus, to protect taxpayers, Amendment 1 requires voter approval for certain state and local government tax increases and restricts property, income, and other taxes. *See* Legislative Council of the Colorado General Assembly, *An Analysis of 1992 Ballot Proposals* 6 (1992); Colo. Const. art. § 20(4). By its terms, Amendment 1 also limits the growth of state revenues, usually met by tax increases, by restricting the increase of fiscal year spending to the rate of inflation plus population increase, unless voter approval for an increase in spending is obtained. Colo. Const. art. X, § 20(7)(a). If the revenues of the state or a local government increase beyond the allowed limits on fiscal year spending, any excess above the allowed limit or voter-approved increase must be refunded to the taxpayers. *Id.* § 20(1). The relevant parts of Amendment 1 are set out in the Appendix to this opinion.

## Amendment 8

Article XXVII of the Colorado Constitution (Amendment 8) was also an initiated constitutional amendment on the ballot in the 1992 general election. The proponents of Amendment 8 contended that the original intent in enacting the state-supervised lottery was to dedicate all lottery proceeds to parks, outdoor recreation, and open space. *See* Legislative Council of the Colorado General Assembly, *An Analysis of 1992 Ballot Proposals* 41 (1992). According to the proponents of Amendment 8, less than half of the lottery proceeds were currently being placed in the Conservation Trust Fund and the Division of Parks and Outdoor Recreation.[2] Instead, the proponents stated that the majority of the proceeds were being used for capital construction, a purpose not originally contemplated. Therefore, "[e]stablishing the lottery distribution in the state constitution will ensure that these funds will be returned to parks and outdoor recreation as the proponents originally intended." *Id.* Amendment 8 accomplishes these purposes by allocating the net lottery proceeds to the Conservation Trust Fund, the Great Outdoors Colorado Trust Fund, and the Division of Parks and Outdoor Recreation.

Amendment 8 was approved by a vote of 876,424 to 629,490, and thus received 64,116 more "Yes" votes than did Amendment 1. The relevant provisions of Amendment 8 are also set out in the Appendix to this opinion.

## Limited Gaming Amendment

Article XVIII, section 9 of the Colorado Constitution (the Limited Gaming Amendment) was initially adopted by the voters in the 1990 general election, and became effective by proclamation of the Governor on January 3, 1991. The Limited Gaming Amendment legalized limited gaming in Central City, Black Hawk, and Cripple Creek as of October 1, 1991. The text of the pertinent provisions of the Limited Gaming Amendment are also set out in the Appendix.

## II

### Interrogatory No. 2

Are any lottery proceeds dedicated pursuant to the provisions of article XXVII

---

**2.** The Conservation Trust Fund was created pursuant to section § 29–21–101, 12A·C.R.S. (1986). Each eligible county, municipality, and special district is apportioned a share of the proceeds from the Conservation Trust Fund according to a formula established by the General Assembly. § 29–21–101(2), 12A C.R.S. (1986).

of the state constitution, which was also approved at the 1992 general election, subject to the limitation on state fiscal year spending set forth in section 20(7)(a) of article X of the state constitution?

## A

In S.B. 93–74, the General Assembly is seeking to comply with the provisions of Amendment 1 by enacting legislation consistent with the state fiscal year spending limit of Amendment 1 and to define certain terms used in Amendment 1. S.B. 93–74, sec. 1, § 24–77–101.[3] One of the terms used by Amendment 1 and defined by S.B. 93–74 is "state fiscal year spending." *See* Colo. Const. art. X, § 20(7)(a); S.B. 93–74, sec. 1, § 24–77–102(17)(a). Amendment 1 provides:

(7) Spending limits. (a) The maximum annual percentage change in *state fiscal year spending* equals inflation plus the percentage change in state population in the prior calendar year, adjusted for revenue changes approved by voters after 1991.

Colo. Const. art. X, § 20(7)(a) (emphasis added). While Amendment 1 does not specifically define *"state* fiscal year spending," it defines "fiscal year spending" as "all district expenditures and reserve increases except, as to both, those for refunds made in the current or next fiscal year or those from gifts, federal funds, collections for another government, pension contributions by employees and pension fund earnings, reserve transfers or expenditures, damage awards, or property sales." Colo. Const. art. X, § 20(2)(e).

■ The question is what net lottery proceeds, if any, are subject to the state fiscal year spending limit contained in Amend-

ment 1. The General Assembly has attempted to answer this question in S.B. 93–74. As defined in S.B. 93–74:

(17)(a) "State fiscal year spending" means all state expenditures and reserve increases occurring during any given fiscal year … including, but not limited to, state expenditures or reserve increases from:

. . . .

(III) net lottery proceeds distributed to the capital construction fund for payment of debt service on the obligations described in section 3(1)(c) of article XXVII of the state constitution for the period through the fourth quarter of the state's fiscal year 1997–1998; and

(IV) net lottery proceeds allocated to the general fund pursuant to section 3(1)(b)(III) of article XXVII of the state constitution for the period beginning with the first quarter of the state's fiscal year 1998–1999.

. . . .

(b) "State fiscal year spending" does not include reserve transfers or expenditures or any state expenditures or reserve increases:

. . . .

(IX) from net proceeds from state-supervised lottery games, as defined in section 3(1) of article XXVII of the state constitution; except that those portions of such proceeds which are specified in subparagraphs (III) and (IV) of paragraph (a) of this subsection (17) are included in state fiscal year spending.

S.B. 93–74, sec. 1, § 24–77–102(17). In the briefs filed in this court, the amici have advanced diverse resolutions to Interrogatory No. 2.[4]

3. All references to S.B. 93–74 and its sections are to the advance unofficial draft of the enrolled bill.

4. Relying on language in *In re House Bill No. 1353,* 738 P.2d 371, 372 (Colo.1987) and *Lamm v. Barber,* 192 Colo. 511, 522, 565 P.2d 538, 546 (1977), *overruled on other grounds by Board of County Commissioners v. Fifty–First General Assembly,* 198 Colo. 302, 599 P.2d 887 (1979), the General Assembly takes the position that the provisions of S.B. 93–74 are presumed to be constitutional and must be proved unconstitu-

tional beyond a reasonable doubt. The statutes in question in *In re House Bill No. 1353* and *Lamm v. Barber,* however, had already been passed by both houses of the General Assembly when we were asked to review their constitutionality. No such presumption of constitutionality arises when we are asked by the General Assembly to address the constitutionality of legislation that has not yet been passed by both houses of the General Assembly. *In re Senate Resolution No. 2,* 94 Colo. 101, 112–13, 31 P.2d 325, 330 (1933).

According to the General Assembly, the most significant concepts contained in Amendment 1 for purposes of these interrogatories are the broad scope of state revenues subject to the spending limit, and the fact that the spending limit is dependent on year-to-year fluctuations in state revenues. The General Assembly contends that although phrased in terms of a "spending limit," Amendment 1's limit on fiscal year spending is in reality a limit on the revenues that can be raised each year because "spending" is defined not only as "all district expenditures," but also as "reserve increases." *See* Colo. Const. art. X, § 20(2)(e). In the view of the General Assembly, Amendment 1 controls the growth of government by controlling the ability to raise revenues.

The General Assembly recognizes that it is the duty of this court "whenever possible, to give effect to the expression of the will of the people contained in constitutional amendments adopted by them." *In re Interrogatories Propounded by the Senate Concerning House Bill 1078*, 189 Colo. 1, 7, 536 P.2d 308, 313 (1975). When two constitutional amendments are simultaneously adopted, the court should not resort to rules that give effect to one provision at the expense of the other unless there is an irreconcilable, material, and direct conflict between the two amendments. *Id.* at 7–8, 536 P.2d at 313–14. When constitutional amendments enacted at the same election are in such irreconcilable conflict, "the one which receives the greatest number of affirmative votes shall prevail in all particulars as to which there is a conflict." § 1–40–113, 1B C.R.S. (1992 Supp.); *In re House Bill 1078*, 189 Colo. at 8, 536 P.2d at 314. "The test for the existence of a conflict is: Does one authorize what the other forbids or forbid what the other authorizes?" *In re House Bill 1078*, 189 Colo. at 7, 536 P.2d at 313.

The General Assembly asserts that under this test the purposes of Amendment 1 and Amendment 8 are not in irreconcilable conflict, but that there is a potential conflict if both are applied literally. According to the General Assembly, S.B. 93–74 resolves this potential conflict by providing that funds dedicated to "Great Outdoors Colorado" purposes (which includes the funds administered by the Great Outdoors Colorado Trust Fund, the Conservation Trust Fund, and funds given to the Division of Parks and Outdoor Recreation) are exempt from the limit on state fiscal year spending, but that the remaining funds (those which are earmarked for the payment of capital construction obligations and the spill-over into the general fund) are fully subject to the spending limit.

The General Assembly alternatively claims that Amendment 1 and Amendment 8 are in fact in irreconcilable conflict. The General Assembly asserts in argument that all net lottery proceeds are subject to Amendment 1's limit on state fiscal year spending, which creates an irreconcilable conflict with Amendment 8. If none of the lottery proceeds were subject to the spending limit, on the other hand, the General Assembly reasons that there would be an irreconcilable conflict with Amendment 1 and a violation of Amendment 1's stated "preferred interpretation" of "reasonably restrain[ing] most the growth of government." Colo. Const. art. X, § 20(1). Thus, because Amendment 8 received more affirmative votes than did Amendment 1, the General Assembly concludes that Amendment 8 must "prevail in all particulars as to which there is a conflict." § 1–40–113.

The Attorney General asserts that Amendment 1 and Amendment 8 do not conflict at all. Amendment 8 merely dedicates net lottery proceeds to outdoor projects, while Amendment 1 defines what revenues are included in a government's total fiscal year spending. The two amendments therefore address different issues affecting revenue collection and disbursement. The Attorney General concludes, however, that while most of the net lottery proceeds are to be included in Amendment 1's calculation of state fiscal year spending, those moneys dedicated to the Conservation Trust Fund are specifically excluded from the fiscal year spending under Amendment

1 as "collections for another government."[5] *See* Colo. Const. art. X, § 20(2)(e).

According to the statement of position filed by the Governor, net lottery proceeds dedicated to Colorado's wildlife, park, river, trail, and open space heritage pursuant to Amendment 8 are not subject to the revenue and spending limits placed on state and local governments by Amendment 1 because (1) net lottery proceeds are not state tax or fee revenues; (2) net lottery proceeds fluctuate uncontrollably and it is untenable that the dictates of an appointed board such as the Great Outdoors Colorado Trust Fund Board (the Board) should control the annual fiscal spending of the state; and (3) Amendment 8 represents a "revenue change[ ] approved by the voters after 1991," which is specifically exempted from fiscal year spending under Amendment 1. *See* Colo. Const. art. X, § 20(7)(a).

Citizens for Great Outdoors Colorado, Inc. (Great Outdoors Colorado, Inc.), the drafter of Amendment 8, takes the position that none of the net lottery proceeds are to be counted in state fiscal year spending and advances a number of alternative reasons for this result. It first asserts that because the Board is neither a "district" nor a part of the state, net lottery proceeds should be excluded from state fiscal year spending. Next, it claims that the proceeds should be excluded as a matter of sound public policy because the proceeds are not derived from taxation and cannot be controlled through tax legislation or through changes in tax policy. Great Outdoors Colorado, Inc. also contends that it is poor public policy to interpret state fiscal year spending as including the direct and indirect expenditure of net lottery proceeds

by the Division of Wildlife and the Division of Parks and Outdoor Recreation because that interpretation will lead to constant fiscal crisis. Moreover, because Great Outdoors Colorado Trust Fund distributions to state agencies are "custodial funds," Colo. Const. art. XXVII, § 5(2), they are not "state money" or "state funds" and thus should not be included within state fiscal year spending.

Great Outdoors Colorado, Inc. further alleges that net lottery proceeds are properly characterized as "property sales," which are specifically excluded under Amendment 1's definition of state fiscal year spending. Colo. Const. art. X, § 20(2)(e). Alternatively, it views distributions from the Great Outdoors Colorado Trust Fund to units of state government as "gifts" outside Amendment 1's definition of state fiscal year spending. *Id.*

Finally, Great Outdoors Colorado, Inc. asserts that if net lottery proceeds are part of state fiscal year spending, then the adoption of Amendment 8 was a "revenue change[ ] approved by voters after 1991." *Id.* § 20(7)(a). If net lottery proceeds are considered part of state fiscal year spending, then Amendment 1 and Amendment 8 are in direct conflict because Amendment 8 requires increased spending to achieve its purposes and Amendment 1 prohibits any such increased spending. Because Amendment 8 received more votes than Amendment 1, Amendment 8 prevails in the event of any inconsistency or contradiction. *In re House Bill 1078*, 189 Colo. at 8, 536 P.2d at 314–15.

Douglas Bruce, the drafter of Amendment 1, takes the opposite position from

---

5. The state lottery is authorized by article XVIII, § 2 of the Colorado Constitution, which provides:

Any provision of this constitution to the contrary notwithstanding, the general assembly may establish a state-supervised lottery. Unless otherwise provided by statute, all proceeds from the lottery, after deduction of prizes and expenses, shall be allocated to the conservation trust fund of the state for distribution to municipalities and counties for park, recreation, and open space purposes. Colo. Const. art. XVIII, § 2(7). After section 2(7) was adopted, the General Assembly created the Colorado Lottery Commission, § 24–35–207, 10A C.R.S. (1988), and the lottery fund, § 24–35–210, 10A C.R.S. (1988 & 1992 Supp.). Prior to the adoption of Amendment 8, § 24–35–210 provided that a certain proportion of the net proceeds of the lottery would be transferred to the Conservation Trust Fund from the lottery fund, § 24–35–210(4.1)(a), 10A C.R.S. (1992 Supp.), and also that a percentage of net lottery proceeds would be appropriated to the Division of Parks and Outdoor Recreation, § 24–35–210(4)(c), 10A C.R.S. (1992 Supp.).

Great Outdoors Colorado, Inc. He contends that Amendment 1 and Amendment 8 are not in conflict, and that all net lottery proceeds (indeed all gross lottery proceeds)[6] are subject to the limit on state fiscal year spending.[7]

## B

We first address whether Amendment 1 and Amendment 8 are in irreconcilable, material, and direct conflict. The analysis for determining whether two constitutional amendments simultaneously adopted are in direct conflict was established in *In re House Bill 1078*, 189 Colo. 1, 536 P.2d 308 (1975), where we stated:

> We address ourselves to the question as to whether the two amendments are in conflict. In doing so, we are fully mindful that it is our duty, whenever possible to give effect to the expression of the will of the people contained in constitutional amendments adopted by them. We have concluded that the two amendments are in conflict. The test for the existence of a conflict is: Does one authorize what the other forbids or forbid what the other authorizes?

*Id.* at 7, 536 P.2d at 313.

In this case, we conclude that Amendment 1 and Amendment 8 are not in irreconcilable, material, and direct conflict. *See id.* Amendment 1 does not "authorize what [Amendment 8] forbids or forbid what [Amendment 8] authorizes." *Id.* A

central purpose of Amendment 1 is to require voter approval for certain state and local government tax increases. Amendment 1 also places limits on the growth of government revenues, without prior voter approval, as a whole. It does not, however, forbid the dedication of a part of that whole to a specific purpose. With specific exceptions, Amendment 8, on the other hand, dedicates the net proceeds of the state-supervised lottery to specific purposes because of the perception that the General Assembly had diverted net lottery proceeds away from the original purposes of the lottery to capital construction. Legislative Council of the Colorado General Assembly, *An Analysis of 1992 Ballot Proposals* 41 (1992).[8]

Because we conclude that Amendment 1 and Amendment 8 are not in irreconcilable conflict, we do not resort to the application of the greatest number of affirmative votes provision of section 1–40–113. *In re House Bill 1078*, 189 Colo. at 8–9, 536 P.2d at 314–15 (applying section 1–40–113 where amendments directly conflicted). The Governor and Great Outdoors Colorado, Inc., among others, however, have asserted that we must construe Amendment 1 terms such as "fiscal year spending" and "district," as well as certain specific exclusions from Amendment 1, so as to except all or most of the net lottery proceeds from the Amendment 1 spending and revenue limits. According to these parties, any other con-

---

6. As submitted by the General Assembly and as accepted by this court, Interrogatory No. 2 pertains only to "net lottery proceeds." The question of the proper classification of "gross lottery proceeds" is not before the court in this original proceeding and we express no opinion thereon.

7. Citing *Bedford v. Sinclair*, 112 Colo. 176, 182, 147 P.2d 486, 488–89 (1944), Bruce claims that his own interpretation of the provisions of Amendment 1, as its author, are to be accorded deference or considerable weight. *Bedford* stated, "[w]e think the evident contemporary interpretation of those actively promoting the amendment, should be accorded considerable weight." *Id.* at 182, 147 P.2d at 489. Neither Bruce nor Great Outdoors Colorado, Inc., the drafter of Amendment 8, have pointed to any statements constituting "evident contemporary interpretation[s]" of the interrelationship of Amendment 1 and Amendment 8. We conclude

that the present opinions of Bruce and Great Outdoors Colorado, Inc. on the issues presently before the court must stand on their own intrinsic merits and must be justified by the texts of the amendments as approved by the voters of Colorado.

8. In the view of both the Governor and Great Outdoors Colorado, Inc., Amendment 8 can be interpreted as a "revenue change[ ] approved by voters after 1991," which is exempted from fiscal year spending under Amendment 1. *See* Colo. Const. art. X, § 20(7)(a). However, Amendment 8 does not speak to any change in the total amount of net proceeds generated by the lottery, only to the purposes to which the proceeds are distributed. We therefore determine that Amendment 8 does not constitute a revenue change approved by the voters after 1991.

struction of the terms of Amendment 1 would place Amendment 1 and Amendment 8 in irreconcilable, material, and direct conflict.

## C

■ If the sale of lottery tickets constitutes a "property sale," then the proceeds would be excluded under the terms of Amendment 1 from fiscal year spending. Colo. Const. art. X, § 20(2)(e). Great Outdoors Colorado, Inc. asserts that lottery ticket sales are encompassed within the plain meaning of a "property sale" because: (1) a lottery ticket is property which is sold; (2) the sellers and purchasers of such tickets have rights therein that are protected by law; and (3) the estate in such tangible assets is transferred to purchasers for consideration.

The Attorney General objects that whether or not a lottery ticket is "property" to the individual purchasing the ticket, it is not the property of the state which has been transferred. To the extent that the state has property rights in the lottery, they are the exclusive right to operate the lottery and to receive its proceeds. These rights are not transferred to the purchaser of a lottery ticket. Moreover, in the Attorney General's view, if the sale of lottery tickets is a sale of property for purposes of Amendment 1, there is no logical reason not to also exclude fees derived from the "sale" of drivers' licenses and so forth. Such an exemption would only encourage the government to increase revenues by the imposition and "sale" of more and more state-granted rights, a result inconsistent with Amendment 1's command that "[i]ts preferred interpretation shall reasonably restrain most the growth of government." *Id.* § 20(1).

The General Assembly contends that there are two reasons for Amendment 1's exemption of property sales from state fiscal year spending: (1) the exemption eliminates spending restrictions on the occasional sale of state property, which simply converts an asset from tangible form to cash; and (2) it encourages the state to permanently divest itself of tangible assets, thereby returning property to the property tax rolls and promoting private economic activity. Because repetitive sales of lottery tickets do not fulfill either purpose in any way, they should not be considered as the sale of property under Amendment 1. We find the General Assembly's interpretation persuasive and conclude that the sale of lottery tickets does not constitute a "property sale" under Amendment 1.

## D

■ Great Outdoors Colorado, Inc. also urges us to hold that distributions from the Great Outdoors Colorado Trust Fund to units of state government are properly characterized as "gifts" outside Amendment 1's definition of fiscal year spending. The General Assembly counters that Amendment 8 does not refer to Great Outdoors Colorado Trust Fund distributions as "gifts" to state and local governments. Instead, Amendment 8 speaks of "investments" through the Division of Wildlife and the Division of Parks and Outdoor Recreation, and of "grants" to those divisions and to local governments. Colo. Const. art. XXVII, § 5(1).

As the General Assembly points out, Amendment 1 does not use the terms "gift" and "grant" synonymously. "Gifts" are exempt from fiscal year spending. *See* Colo. Const. art. X, § 20(2)(e). If an entity receives more than ten percent of its revenues in "grants," however, the entity is disqualified as an enterprise. *Id.* § 20(2)(d). Again, we find the reasoning of the General Assembly persuasive and determine that net lottery proceeds are not to be excluded from state fiscal year spending as "gifts."

## E

■ Great Outdoors Colorado, Inc. also asserts that the Board is not a "district" for purposes of Amendment 1 because it is a constitutionally designated trustee, performing none of the powers traditionally exercised by government. The Board is not dependent on appropriations by the General Assembly, and the state has and

can have no interest in the funds. While Amendment 8 makes the Board a political subdivision of the state, it is not an agency of state government. *See* Colo. Const. art. XXVII, § 6(3).

According to Great Outdoors Colorado, Inc., the Board is not part of state government, nor is it a "local government" under Amendment 1 because it performs none of the powers traditionally exercised by government, it has no taxpayers, and it lacks the capacity to comply with Amendment 1's requirements to conduct elections. Because the Board is neither a part of state government nor a local government, it cannot be considered a "district." Great Outdoors Colorado, Inc. asserts that under Amendment 1, " '[d]istrict' means the state or any local government, excluding enterprises," and that distributions of net lottery proceeds cannot be part of state fiscal year spending.

The Attorney General states that this interpretation of "district" is too narrow. In *In re Interrogatories by the Colorado State Senate Concerning House Bill 1247*, 193 Colo. 298, 566 P.2d 350 (1977), cited by Great Outdoors Colorado, Inc., we held that the Housing Finance Authority, a political subdivision, but not an agency of the state, could incur obligations in its own name, for which the state was not liable, without violating the state constitutional prohibitions against the state contracting "debt" by loan. *See* Colo. Const. art. XI, §§ 3, 4. We reasoned that the debt contracted by the Housing Finance Authority was not a debt of the state. *In re House Bill 1247*, 193 Colo. at 304–05, 566 P.2d at 355. However, our holding in *In re House Bill 1247* does not help Great Outdoors Colorado, Inc. in this case.

While it is not clear whether proceeds paid into the Great Outdoors Colorado Trust Fund are "revenues" for purposes of Amendment 1, Colo. Const. art. X, § 20(1), we believe that excluding net lottery proceeds from the purview of Amendment 1 on the basis of a characterization of the Board as a "district" or "non-district" is erroneous. As the Attorney General points out, net lottery proceeds are initially received by the state. The Colorado Lottery Commission receives moneys from the sale of lottery tickets. From these funds, the Colorado Lottery Commission pays its operating costs, prizes, and commissions and bonuses to retailers. It then pays the net lottery proceeds to the State Treasurer for disbursement. The State Treasurer must distribute the funds for the governmental purposes listed in Amendment 8. All net lottery proceeds are therefore paid into the state, and the technical characterization of the Board as a "district" or "non-district" is not dispositive.

Alternatively, Amendment 8 defines the Board as a "political subdivision of the state." Colo. Const. art. XXVII, § 6(3). It is not a local government under Amendment 1 because its activities and authority are not confined to a specific geographical area within the state, it addresses matters of statewide concern, and it was created by a statewide vote of the electorate. The Board is decidedly not a private entity. Nor is it as presently constituted an "enterprise" under Amendment 1. *See* Colo. Const. art. X, § 20(2)(d). While Amendment 8 also states that the Board is not an "agency" of the state, we conclude that the best reading of Amendment 1 is to exclude from state fiscal year spending limits only those entities that are non-governmental, and the Board is essentially governmental in nature. This interpretation of Amendment 1 is the interpretation that "reasonably restrain[s] most the growth of government." Colo. Const. art. X, § 20(1).

F

Our analysis is not complete, however, based on our conclusion that Amendment 1 and Amendment 8 are not in irreconcilable, material, and direct conflict. Unlike *In re House Bill 1078*, we must also address whether there is an implicit conflict between the two amendments. We agree that in doing so, "it is our duty, whenever possible to give effect to the expression of the will of the people contained in constitutional amendments adopted by them." *In re House Bill 1078*, 189 Colo. at 7, 536 P.2d at 313. The General Assembly and others

contend that while Amendment 1 and Amendment 8 are not in irreconcilable, material, and direct conflict, the inclusion of all net lottery proceeds in the calculation of state fiscal year spending creates an implicit conflict between the two amendments. We agree and conclude that S.B. 93–74 represents a reasonable resolution of the implicit conflict between the two constitutional amendments and gives effect to the expression of the will of the people in enacting both amendments.

Because the General Assembly does not presently control the inflow of net lottery proceeds, fluctuations in the growth of the lottery might imperil other state projects and programs. For example, if all net lottery proceeds were included in the calculation of state fiscal year spending and the proceeds grew faster than permitted by inflation and population increase, then state fiscal year spending would increase in a way that the General Assembly could not predict. As a result, the growth in net lottery proceeds might force a refund in order to comply with the spending limits of Amendment 1. Because Amendment 8 dedicates most net lottery proceeds in a specific way, such a refund would necessarily take away from another part of the state budget.

A potentially more serious problem arises at the local level of government.[9] The Colorado Municipal League points out that while fluctuations in the growth of net lottery proceeds may be small at the state level, these fluctuations become large at the local level. If net lottery proceeds distributed to a local district are included within the local district's fiscal year spending, a local district might therefore be forced to decline Amendment 8 grants. Such a result clearly would frustrate the purpose for which Amendment 8 was adopted.

We find that the General Assembly has reasonably resolved the implicit conflict between Amendment 1 and Amendment 8 in S.B. 93–74 and has given effect to the

expression of the will of the people in the constitutional amendments adopted by them. By providing that net lottery proceeds constitutionally dedicated by Amendment 8 to Great Outdoors Colorado purposes (proceeds going to the Conservation Trust Fund, the Division of Parks and Outdoor Recreation, and the Great Outdoors Colorado Trust Fund) are exempt from Amendment 1, the General Assembly has minimized the effects of uncontrolled fluctuations in net lottery proceeds while ensuring that the underlying purposes of Amendment 8 are fulfilled. See S.B. 93–74, sec. 1, § 24–77–102(17)(b)(IX).

On the other hand, by including the net lottery proceeds constitutionally dedicated by Amendment 8 to the capital construction fund and the excess proceeds that spill over into the general fund in state fiscal year spending, the General Assembly has advanced one of the underlying purposes of Amendment 1 with little or no effect on the purposes of Amendment 8. See S.B. 93–74, sec. 1, § 24–77–102(17)(a)(III), (IV). Because the proceeds constitutionally dedicated by Amendment 8 to the capital construction fund are in the specific amounts set out in the amendment, and because the General Assembly exercises control over the general fund, fluctuations in net lottery proceeds should not have a damaging effect on state budget planning. See Colo. Const. art. XXVII, § 3(1)(c).

Accordingly, we agree that the S.B. 93–74's characterization of net lottery proceeds that are constitutionally dedicated to Great Outdoors purposes represents a reasonable resolution of the implicit conflict between Amendment 1 and Amendment 8 and also gives effect to the expression of the will of the people contained in the two constitutional amendments. In our view, the characterization of net lottery proceeds properly harmonizes the underlying purposes of the two amendments without ignoring or minimizing the purposes of one amendment in favor of the other. We an-

---

9. We recognize that Interrogatory No. 2 only pertains to the question of whether net lottery proceeds are to be included in *state* fiscal year spending. However, the effects at the local lev-

el of a particular construction of Amendment 1 and Amendment 8 are relevant to the extent that they demonstrate an implicit conflict between the two amendments.

swer Interrogatory No. 2 in the affirmative.

### III

### Interrogatory No. 5

Can the General Assembly enact limitations on revenues collected by the limited gaming control commission, created in section 9(2) of article XVIII of the state constitution, in order to comply with the limitation on state fiscal year spending set forth in section 20(7)(a) of article X of the state constitution?

### A

■ Interrogatory No. 5 arises from the General Assembly's need to enact legislation complying with Amendment 1. Amendment 1 defines fiscal year spending, in general, as all state expenditures and reserve increases. Colo. Const. art. X, § 20(2)(b), (e). As a consequence, not only does Amendment 1 attempt to limit the amount that the state spends, it also attempts to limit the amount that the state does not spend, but collects, and keeps in reserve. If state revenues increase in a given year, then even if the state does not spend the additional money, it may violate the spending limits of Amendment 1 by putting that money in reserve. In order to assure that it complies with Amendment 1, it is therefore necessary that the General Assembly provide not only for its expenditures, but also for its collection of revenues. If for any reason its collection of revenues should increase beyond the limits set by Amendment 1, then the state would be required by Amendment 1 to refund the

surplus to the taxpayers. *Id.* § 20(1), (7)(d).

In light of the constraints imposed by Amendment 1, the General Assembly is concerned about its authority to regulate the total amount of revenues collected by the state and therefore submitted Interrogatory No. 5. To answer this interrogatory, it is necessary to examine the constitutional and statutory provisions on which the authority of the Colorado Limited Gaming Commission (Commission) is based.

The Limited Gaming Amendment was approved by voters in 1990, and it became effective by proclamation of the Governor on January 3, 1991. The Limited Gaming Amendment, which legalized limited gaming in Central City, Black Hawk, and Cripple Creek as of October 1, 1991, provided for the creation of a limited gaming control commission that "shall promulgate all necessary rules and regulations relating to the licensing of limited gaming...." Colo. Const. art. XVIII, § 9(2).[10] Pursuant to the Limited Gaming Amendment, the General Assembly enacted the "Limited Gaming Act of 1991." §§ 12–47.1–101 to –1401, 5B C.R.S. (1991 & 1992 Supp.). The Commission was created, § 12–47–301, 5B C.R.S. (1991), within the newly created Division of Gaming in the Department of Revenue, § 12–47.1–201, 5B C.R.S. (1991), and the Commission's powers and duties were delineated, § 12–47.1–302, 5B C.R.S. (1991).[11]

The Limited Gaming Amendment also provides in pertinent part:

(5)(a) Up to a maximum of forty percent of the adjusted gross proceeds [12] of

---

**10.** The Limited Gaming Amendment provides that:

[t]he administration and regulation of this section 9 shall be under an appointed limited gaming control commission, referred to in this section 9 as the commission; said commission to be created under such official or department of the state of Colorado as the general assembly shall provide by May 1, 1991.... The commission shall promulgate all necessary rules and regulations relating to the licensing of limited gaming by October 1, 1991.... Such rules and regulations shall include the necessary defining of terms that are not otherwise defined.

Colo. Const. art. XVIII, § 9(2).

**11.** The Commission has subsequently published extensive rules and regulations concerning limited gaming, and among other things, has established requirements for obtaining a gaming license and specified the amount of various fees and costs which must be paid by licensees. The regulations also set forth the percentage of adjusted gross proceeds that the Commission has determined must be paid annually by each licensee.

**12.** The Limited Gaming Amendment defines "adjusted gross proceeds" as

limited gaming shall be paid by each licensee, in addition to any applicable license fees, for the privilege of conducting limited gaming. *Such percentage shall be established annually by the [limited gaming control] commission according to the criteria established by the general assembly* in the implementing legislation to be enacted ... [by May 1, 1991].

(b)(I) From the moneys in the limited gaming fund, the state treasurer is hereby authorized to pay all ongoing expenses of the commission and any other state agency, related to the administration of this section 9. Such payments shall be made upon proper presentation of a voucher prepared by the commission in accordance with statutes governing payments of liabilities incurred on behalf of the state. *Such payment shall not be conditioned on any appropriation by the general assembly.*

. . . .

(c) The general assembly shall enact, amend, or repeal such laws as are necessary to implement the provisions of this section 9, by May 1, 1991.

Colo. Const. art. XVIII, § 9(5) (emphasis added). At the end of each fiscal year, the State Treasurer is to distribute the balance remaining in the limited gaming fund as follows: fifty percent to the state general fund or such other fund as the General Assembly shall provide; twenty-eight percent to the state historical fund (of which twenty percent is to be used for the preservation and restoration of Central City, Black Hawk, and Cripple Creek, and eighty percent used for historic preservation and restoration of historical sites and municipalities throughout the state in a manner to be determined by the General Assembly, *id.* § 9(5)(b)(III)); twelve percent to the governing bodies of Gilpin and Teller counties; and the remaining ten percent to the governing bodies of Central City, Black Hawk, and Cripple Creek. *Id.* § 9(5)(b)(II).

**B**

The General Assembly asserts that because the Commission was created within one of the departments of the executive branch of state government, and because it does not qualify as an enterprise under Amendment 1, the Commission is subject to the provisions of Amendment 1 relating to state fiscal year spending.[13] The General Assembly contends that it is necessary to impose a limit on the revenue generated by limited gaming in order to implement Amendment 1. According to the General Assembly, insofar as the Commission's power to raise revenues and make expenditures without the need for an appropriation conflicts with Amendment 1's spending limits, Amendment 1 must prevail because it was enacted later. *In re Interrogatories Concerning House Joint Resolution No. 1008*, 171 Colo. 200, 205, 467 P.2d 56, 59 (1970); *In re Interrogatories Propounded by the Senate Concerning House Bill 1060*, 168 Colo. 563, 566, 452 P.2d 382, 384 (1969).

The General Assembly concludes that S.B. 93–74 gives effect to both Amendment 1 and the Limited Gaming Amendment, while minimizing any conflict between the revenue limit of Amendment 1 and revenue-raising authority of the Commission. Section 13 of S.B. 93–74 provides in relevant part:

(2) For the 1993–94 fiscal year and fiscal years thereafter, the General Assembly, in the General appropriation bill or by separate bill, shall prescribe the total amount of revenues that may be collected and the total amount of allowable expenditures which may be made by the division and the commission for the fiscal year. The amounts prescribed by the General Assembly pursuant to this sub-

---

the total amount of all wagers made by players on limited gaming less all payments to players; said payment to players being deemed to include all payments of cash premiums, merchandise, tokens, redeemable game credits, or any other thing of value. Colo. Const. art. XVIII, § 9(4)(a).

**13.** The parties have assumed that the Commission and the revenues from limited gaming are subject to the spending and revenue limits of Amendment 1. For the purpose of this opinion, we assume, without deciding, that this is the case.

section (2) shall be based upon the determination of the limitation on state fiscal year spending under section 20 of article X of the state constitution and upon decisions establishing the level of activity of all departments and agencies of state government, including the division and the commission.

S.B. 93–74, sec. 13, § 12–47.1–102.5. The General Assembly also views S.B. 93–74 as consistent with the provisions of the Limited Gaming Amendment, because S.B. 93–74 does not make payment of the ongoing expenses of the Commission subject to legislative appropriation and because it does not intrude on the Commission's authority to set the *rate* of the limited gaming tax.

The Attorney General takes the narrower position that the General Assembly has the authority to limit Commission revenues by using its constitutional authority to establish criteria for setting the gaming tax on adjusted gross proceeds, Colo. Const. art. XVIII, § 9(5)(a), and by utilizing its constitutionally based legislative authority to adopt enabling legislation, *id.* § 9(5)(c). The source of this legislative power, according to the Attorney General, is the Limited Gaming Amendment itself, not Amendment 1. Thus, although the General Assembly may not set the amount of the gaming tax because that is solely in the discretion of the Commission, *id.* § 9(5)(a), the General Assembly may limit the dollar amount generated by the tax.

The Commission responds that the General Assembly cannot enact limitations on revenues collected by the Commission because doing so would usurp the sole authority granted to the Commission by the Limited Gaming Amendment to determine revenues related to limited gaming, including the applicable percentage of the gaming tax to be paid by casinos. Colo. Const. art. XVIII, § 9(5)(a). In the Commission's view, the provisions of Amendment 1 do not conflict with the Commission's sole authority to determine revenues related to limited gaming.

Further, according to the Commission, giving the words in the Limited Gaming Amendment their "natural and popular meaning usually understood by the people who adopted them," the Commission has been granted sole authority by the people to determine revenues related to limited gaming. *Urbish v. Lamm,* 761 P.2d 756, 760 (Colo.1988). If the General Assembly were permitted to set criteria allowing the Commission to collect only a specific amount of revenue, the Commission's determination of the gaming-tax percentage, as well as other necessary conditions it places on gaming, would be nothing more than the exercise of a ministerial function, and the Commission's authority to make those determinations would become meaningless. In the Commission's view, the specific provisions of the Limited Gaming Amendment prevail over any inconsistent, but more general, provisions of Amendment 1. In any event, the Commission asserts that because moneys received from the gaming fund have an extremely small impact on the state budget, the sole authority granted to the Commission for collecting and determining gaming revenues will have at most a negligible impact on the General Assembly's ability to budget.

## C

At the outset, we conclude that the Limited Gaming Amendment and Amendment 1 are not in direct conflict. We also determine that the plain language of the Limited Gaming Amendment requires a definitive negative response to Interrogatory No. 5.

In our view, the Limited Gaming Amendment clearly states the assignment of functions relevant to the annual establishment of the percentage of adjusted gross proceeds to be collected from each limited gaming licensee: the Commission establishes the percentage and the General Assembly does not. The power of the General Assembly to establish "criteria" for the Commission cannot reasonably be construed to include the power to usurp the Commission's constitutionally based authority—indeed, duty—to establish annually the percentage of adjusted gross revenues to be collected from limited-gaming licensees. Instead, section 9(5)(a) of the Limited Gaming Amendment expressly pro-

vides that the Commission, and not the General Assembly, has the power to establish such percentages. Lacking the power to establish such percentages, the General Assembly also lacks the power to limit the revenues collected by the Commission.

Amendment 1 does not add anything to the authority of the General Assembly to establish "criteria" to guide the Commission in arriving at the percentage of adjusted gross proceeds of limited gaming to be paid by each licensee. The general practical advisability of controlling revenues in order to avoid the necessity of refunding moneys to taxpayers cannot be elevated and transformed into a source of power to infringe upon the authority expressly granted to the Commission by the Limited Gaming Amendment.

Because the Limited Gaming Amendment prohibits the General Assembly from enacting limitations on revenues collected by the Commission in order to comply with Amendment 1, we answer Interrogatory No. 5 "No." The General Assembly, as previously noted, is naturally concerned about its authority to regulate revenue collection by the state. However, insofar as revenues generated by limited gaming might tend in a given year to violate the spending limits imposed by Amendment 1, the General Assembly may comply with Amendment 1 by decreasing revenues collected elsewhere, or if that is impossible after the fact, the General Assembly may comply with Amendment 1 by refunding the surplus to taxpayers. Colo. Const. art. X, § 20(1).

### IV

Accordingly, with our review limited to the wording of S.B. 93–74, and the wording of the interrogatories as propounded by the General Assembly, we answer Interrogatory No. 2 in the affirmative and Interrogatory No. 5 in the negative.

Justice VOLLACK dissents to Interrogatory No. 2 and concurs in the result only on Interrogatory No. 5; and joins in Justice MULLARKEY's dissent and concurrence.

Justice MULLARKEY dissents to Interrogatory No. 2 and concurs in the result only on Interrogatory No. 5; and joins in Justice VOLLACK'S dissent and concurrence.

### Appendix

*Amendment 1*

**Section 20. The Taxpayer's Bill of Rights. (1) General provisions.** This section takes effect December 31, 1992 or as stated. *Its preferred interpretation shall reasonably restrain most the growth of government.* All provisions are self-executing and severable and supersede conflicting state constitutional, state statutory, charter, or other state or local provisions. Other limits on district revenue, spending, and debt may be weakened only by future voter approval.... Revenue collected, kept, or spent illegally since four full fiscal years before a suit is filed shall be refunded with 10% annual simple interest from the initial conduct. Subject to judicial review, districts may use any reasonable method for refunds under this section, including temporary tax credits or rate reductions. Refunds need not be proportional when prior payments are impractical to identify or return.

. . . .

**(2) Term definitions.** Within this section: (a) "Ballot issue" means a non-recall petition or referred measure in an election.

(b) "District" means the state or any local government, excluding enterprises.

. . . .

(d) "Enterprise" means a government-owned business authorized to issue its own revenue bonds and receiving under 10% of annual revenue in grants from all Colorado state and local governments combined.

(e) *"Fiscal year spending" means all district expenditures and reserve increases except, as to both, those for refunds made in the current or next fiscal year or those from gifts, federal funds, collections for another government, pension contributions by employees and pension fund*

earnings, reserve transfers or expenditures, damage awards, or property sales.

. . . .

(g) "Local growth" for a non-school district means a net percentage change in actual value of all real property in a district from construction of taxable real property improvements, minus destruction of similar improvements, and additions to, minus deletions from, taxable real property. For a school district, it means the percentage change in its student enrollment.

. . . .

(7) **Spending limits.** (a) *The maximum annual percentage change in state fiscal year spending equals inflation plus the percentage change in state population in the prior calendar year, adjusted for revenue changes approved by voters after 1991.*

. . . .

(b) The maximum annual percentage change in each local district's fiscal year spending equals inflation in the prior calendar year plus annual local growth, adjusted for revenue changes approved by voters after 1991 and (8)(b) and (9) reductions.

(c) The maximum annual percentage change in each district's property tax revenue equals inflation in the prior calendar year plus annual local growth, adjusted for property tax revenue changes approved by voters after 1991 and (8)(b) and (9) reductions.

(d) *If revenue from sources not excluded from fiscal year spending exceeds these limits in dollars for that fiscal year, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset.* Initial district bases are current fiscal year spending and 1991 property tax collected in 1992. Qualification or disqualification as an enterprise shall change district bases and future year limits. Future creation of district bonded debt shall increase, and retiring or refinancing district bonded debt shall lower, fiscal year spending and property tax revenue by the annual debt service so funded. Debt service changes, reductions, (1) and

(3)(c) refunds, and *voter-approved revenue changes are dollar amounts that are exceptions to, and not part of, any district base.* Voter-approved revenue changes do not require a tax rate change.

(8) **Revenue limits.** (a) New or increased transfer tax rates on real property are prohibited. No new state real property tax or local district income tax shall be imposed. Neither an income tax rate increase nor a new state definition of taxable income shall apply before the next tax year. Any income tax law change after July 1, 1992 shall also require all taxable net income to be taxed at one rate, excluding refund tax credits or voter-approved tax credits, with no added tax or surcharge.

(b) Each district may enact cumulative uniform exceptions and credits to reduce or end business personal property taxes.

Colo. Const. art. X, § 20 (emphasis added).

*Amendment 8*

**Section 1. Great Outdoors Colorado Program.** (1) The people of the State of Colorado intend that the net proceeds of every state-supervised lottery game operated under the authority of Article XVIII, Section 2 shall be guaranteed and permanently dedicated to the preservation, protection, enhancement and management of the state's wildlife, park, river, trail and open space heritage, except as specifically provided in this article. Accordingly, there shall be established the Great Outdoors Colorado Program to preserve, protect, enhance and manage the state's wildlife, park, river, trail and open space heritage. The Great Outdoors Colorado Program shall include:

(a) Wildlife program grants . . . ;

(b) Outdoor recreation program grants . . . ;

(c) A program to identify, acquire and manage unique open space and natural areas of statewide significance through grants to the Colorado Divisions of Parks and Outdoor Recreation and Wildlife, or municipalities, counties, or other political subdivision of the State, or non-profit land conservation organizations. . . . ; and

(d) A program for grants to match local investments to acquire, develop and manage open space, parks, and environmental education facilities....

**Section 2. Trust Fund created.** A fund to be known as the Great Outdoors Colorado Trust Fund, referred to in this article as the "Trust Fund," is hereby created and established in the Treasury of the State of Colorado.

**Section 3. Moneys allocated to Trust Fund.** (1) Beginning with the proceeds from the fourth quarter of the State's Fiscal year 1992–1993, all proceeds from all programs, including Lotto and every other state-supervised lottery game operated under the authority of Article XVIII, Section 2 of the Colorado Constitution, whether by the Colorado Lottery Commission or otherwise (such programs defined hereafter in this Article as "Lottery Programs"), net of prizes and expenses of the state lottery division and after a sufficient amount of money has been reserved, as of the end of any fiscal quarter, to ensure the operation of the lottery for the ensuing fiscal quarter (such netted proceeds defined hereafter in this Article as "Net Proceeds") are set aside, allocated, allotted, and continuously appropriated as follows, and the Treasurer shall distribute such proceeds no less frequently than quarterly, as follows:

(a) For each quarter through the fourth quarter of the State's Fiscal Year 1997–1998:

(I) to the Conservation Trust Fund and the Division of Parks and Outdoor Recreation in the amounts allocable thereto under statute as amended through January 1, 1992;

(II) to the State's Capital Construction Fund for payment of debt service due from and including September 1, 1993, to and including November 30, 1998, on the obligations described in Subsection (1)(c) of this Section 3....

(III) The State Treasurer shall deposit all remaining Net Proceeds, if any, in trust for the Board of the Trust Fund.

(b) For each quarter including and after the first quarter of the State's Fiscal Year 1998–1999:

(I) Forty percent to the Conservation Trust Fund for distribution to municipalities and counties and other eligible entities for parks, recreation and open space purposes;

(II) Ten percent to the Division of Parks and Outdoor Recreation for the acquisition, development and improvement of new and existing state parks, recreation areas and recreational trails; and

(III) All remaining Net Proceeds in trust to the Board of the Trust Fund, provided, however, that in any state fiscal year in which the portion of the Net Proceeds which would otherwise be given in trust to the State Board of the Trust Fund exceeds the amount of $35 million, to be adjusted each year for changes from the 1992 Consumer Price Index–Denver, the Net Proceeds in excess of such amount or adjusted amount shall be allocated to the General Fund of the State of Colorado.

. . . .

(2) From July 1, 1993, the following sums of money and property, in addition to Net Proceeds as set forth in Section 3(1) above, are set aside, allocated, allotted, and continuously appropriated in trust to the Board of the Trust Fund:

(a) All interest derived from moneys held in the Trust Fund;

(b) Any property donated specifically to the State of Colorado for the specific purpose of benefitting the Trust Fund, including contributions, grants, gifts, bequests, donations, and federal, state, or local grants; and

(c) Such other moneys as may be allocated to the Trust Fund by the General Assembly.

**Section 4. Fund to remain inviolate.** All moneys deposited in the Trust Fund shall remain in trust for the purposes set forth in this article, and no part thereof shall be used or appropriated for any other purpose, nor made subject to any other tax, charge, fee or restriction.

**18**

**Section 5. Trust Fund expenditures.** (1)(a) Expenditures from the Trust Fund shall be made in furtherance of the Great Outdoors Colorado Program, and shall commence in the State Fiscal Year 1993–94. The Board of the Trust Fund shall have the duty too assure that expenditures are made for the purposes set forth in this section and in section 6, and that the amounts expended for each of the following purposes over a period of years be substantially equal:

(I) Investments in the wildlife resources of Colorado through the Colorado Division of Wildlife ... consistent with the purposes set forth in Section 1(1)(a) of this article;

(II) Investments in the outdoor recreation resources of Colorado through the Colorado Division of Parks and Outdoor Recreation ... consistent with the purposes set forth in Section 1(1)(b) of this article;

(III) Competitive grants to the Colorado Divisions of Parks and Outdoor Recreation and Wildlife, and to counties, municipalities or other political subdivisions of the state, or non-profit land conservation organizations ... consistent with the purposes set forth in Section 1(1)(c) of this article;

(IV) Competitive matching grants to local governments or other entities which are eligible for distributions from the conservation trust fund ...;

(b) Provided, however, that the State Board of the Great Outdoors Colorado Trust Fund shall have the discretion (a) to direct that any portion of available revenues be reinvested in the Trust Fund and not expended in any particular year, (b) to make other expenditures which it considers necessary and proper to the accomplishment of the purposes of this amendment.

(2) *All funds provided to state agencies from the Trust Fund shall be deemed to be custodial in nature, and the expenditure of those funds shall not be subject to legislative appropriation or restriction.*

**Section 6. The State Board of the Great Outdoors Colorado Trust Fund.** (1) There shall be established a State Board of the Great Outdoors Colorado Trust Fund.... Members of the Board shall be subject to removal as provided in Article IV, Section 6 of this constitution.

(2) The Board shall be responsible for, and shall have the power to undertake the following actions:

(a) To direct the Treasurer to disburse expendable income from the Trust Fund as the Board may determine by resolution, and otherwise to administer the Trust Fund ...;

(b) To promulgate rules and regulations as are necessary or expedient for the conduct of its affairs and its meetings and of meetings of any committees and generally for the administration of this article ...;

(c) To cause to be published and distributed an annual report, including a financial report, to the citizens, the Governor and the General Assembly of Colorado, ... and to consult with the General Assembly from time to time concerning its objectives and its budget;

(d) To administer the distribution of grants pursuant to Sections 1(1)(c), 1(1)(d), 5(1)(a)(III), and 5(1)(a)(IV) of this article, with the expense of administering said grants to be defrayed from the funds made available to the program elements of said sections;

....

(3) *The Board shall be a political subdivision of the State, and shall have all the duties, privileges, immunities, rights, liabilities and disabilities of a political subdivision of the state,* provided, however, that its organization, powers, revenues and expenses shall not be affected by any order or resolution of the general assembly, except as provided in this constitution. *It shall not be an agency of state government, nor shall it be subject to administrative direction by any department, commission, board, bureau or agency of the state,* except to the extent provided in this constitution....

....

**Section 8. No substitution allowed.** The people intend that the allocation of lottery funds required by this article of the

constitution be in addition to and not a substitute for funds otherwise appropriated from the General Assembly to the Colorado Department of Natural Resources and its divisions.

. . . .

**Section 11. Effective date.** This article shall become effective upon proclamation by the governor and shall be self-implementing. This article shall apply to each distribution of net proceeds from the programs operated under the authority of Article XVIII, Section 2 of the Colorado Constitution, whether by the Colorado Lottery Commission or otherwise, made after July 1, 1993 *and shall supersede any provision to the contrary in Article XVIII, Section 2 or any other provision of law.* Colo. Const. art. XXVII (emphasis added).

*The Limited Gaming Amendment*

**Section 9. Limited gaming permitted.** (1) Any provisions of section 2 of this article XVIII or any other provisions of this constitution to the contrary notwithstanding, limited gaming in the City of Central, the City of Black Hawk, and the City of Cripple Creek shall be lawful as of October 1, 1991.

(2) The administration and regulation of this section 9 shall be under an appointed limited gaming control commission, referred to in this section 9 as the commission; said commission to be created under such official or department of the state of Colorado as the general assembly shall provide by May 1, 1991. . . . The commission shall promulgate all necessary rules and regulations relating to the licensing of limited gaming by October 1, 1991. . . . Such rules and regulations shall include the necessary defining of terms that are not otherwise defined.

(3) Limited gaming shall be subject to the following:

(a) Limited gaming shall take place only in the existing Colorado cities of: the City of Central, county of Gilpin, the City of Black Hawk, county of Gilpin, and the city of Cripple Creek, county of Teller. . . .

(4) As certain terms are used in regards to limited gaming:

(a) "Adjusted gross proceeds" means the total amount of all wagers made by players on limited gaming less all payments to players. . . .

(b) "Limited gaming" means the use of slot machines and the card games of blackjack and poker, each game having a maximum single bet of five dollars.

. . . .

(5)(a) *Up to a maximum of forty percent of the adjusted gross proceeds of limited gaming shall be paid by each licensee, in addition to any applicable license fees, for the privilege of conducting limited gaming. Such percentage shall be established annually by the commission according to the criteria established by the general assembly in the implementing legislation to be enacted pursuant to paragraph (c) of this subsection (5).* Such payments shall be made into a limited gaming fund that is hereby created in the state treasury.

(b)(I) From the moneys in the limited gaming fund, the state treasurer is hereby authorized to pay all ongoing expenses of the commission and any other state agency, related to the administration of this section 9. Such payments shall be made upon proper presentation of a voucher prepared by the commission in accordance with statutes governing payments of liabilities incurred on behalf of the state. *Such payment shall not be conditioned on any appropriation by the general assembly.*

(II) At the end of each state fiscal year, the state treasurer shall distribute the balance remaining in the limited gaming fund, except for an amount equal to all expenses of the administration of this section 9 for the preceding two-month period, according to the following guidelines: fifty percent shall be transferred to the state general fund or such other fund as the general assembly shall provide; twenty-eight percent shall be transferred to the state historical fund, which fund is hereby created in the state treasury; twelve percent shall be distributed to the governing bodies of Gilpin county and Teller county in proportion

to the gaming revenues generated in each county; the remaining ten percent shall be distributed to the governing bodies of the cities of: the City of Central, the City of Black Hawk, and the City of Cripple Creek in proportion to the gaming revenues generated in each respective city.

(III) Of the moneys in the state historical fund, from which the state treasurer shall also make annual distributions, twenty percent shall be used for the preservation and restoration of the cities of: the City of Central, the City of Black Hawk, and the City of Cripple Creek, and such moneys shall be distributed, to the governing bodies of the respective cities, according to the proportion of the gaming revenues generated in each respective city. The remaining eighty percent in the state historical fund shall be used for historic preservation and restoration of historical sites and municipalities throughout the state in a manner to be determined by the general assembly.

(c) The general assembly shall enact, amend, or repeal such laws as are necessary to implement the provisions of this section 9, by May 1, 1991.

Colo. Const. art. XVIII, § 9 (emphasis added).

Justice VOLLACK dissenting as to Interrogatory No. 2, and concurring in the result only as to Interrogatory No. 5:

The majority determines that the answer to Interrogatory No. 2 is "Yes" and the answer to Interrogatory No. 5 is "No." Maj. op. at 2–3. With respect to Interrogatory No. 2, the majority premises its determination on a conclusion that Amendments 1 and 8 are in implicit conflict, and that Amendment 1 encompasses Amendment 8. I disagree. I find no need to engage in conflict analysis. Careful scrutiny of the express language of Amendment 1[1] and Amendment 8,[2] their accompanying ballot titles, and relevant sections of the Colorado Constitution, dictates that lottery proceeds identified in Amendment 8 do not come within Amendment 1's limitation on state

fiscal year spending. The appropriate response to Interrogatory No. 2 is thus "No." I further find that a review of Article XVII, section 9, "the limited gaming amendment," dictates that limited gaming proceeds similarly do not come within Amendment 1's limitation on state fiscal year spending. The appropriate response to Interrogatory No. 5 is also "No."

## I.

The General Assembly propounded an interrogatory referred to as "No. 2" to this court which states as follows:

Are any lottery proceeds dedicated pursuant to the provisions of Article XXVII of the state constitution, which was also approved at the 1992 general election, subject to the limitation on state fiscal spending set forth in section 20(7)(a) of article X of the state constitution?

The majority summarizes the question posed as "what net lottery proceeds, if any, are subject to the state fiscal year spending limit contained in Amendment 1." Maj. op. at 5. In order to answer the interrogatory, we must analyze the relationship between Amendment 1, which purports to reasonably restrain the growth of government, and Amendment 8, which purports to dedicate all proceeds from state-supervised lottery games to preservation and protection of the state's wildlife and open space. Our opinion in *In re Interrogatories Propounded by the Senate Concerning House Bill 1078*, 189 Colo. 1, 536 P.2d 308 (1975), provides an appropriate framework to analyze the present question.

## A.

In *In re Interrogatories Propounded by the Senate Concerning House Bill 1078*, we were called on to answer interrogatories concerning two proposed constitutional amendments regarding reapportionment. The interrogatories were propounded by the Senate after the House adopted a bill that altered the boundary lines of certain

---

**1.** Amendment 1 refers to article X, section 20, of the Colorado Constitution.

**2.** Amendment 8 refers to article XXVII of the Colorado Constitution.

state representative districts. We first noted that one constitutional amendment, No. 6, addressed several subjects in addition to reapportionment and received 386,-284 affirmative votes. The second constitutional amendment, No. 9, was initiated by petition and received 386,725 affirmative votes, or 441 votes more than No. 6. *In re House Bill 1078*, 189 Colo. at 4, 536 P.2d at 311.

We discussed the existing constitutional provisions controlling reapportionment at the outset of our analysis. We subsequently set forth the text of amendment No. 6 and paraphrased the text of amendment No. 9. We examined the relevant text of each amendment, and found that No. 6 "was advertised as a housekeeping amendment" and gave the General Assembly the authority to establish the boundaries of senatorial and representative districts. *Id.* at 7, 536 P.2d at 313–14. We found that No. 9, conversely, established a commission to promulgate reapportionment plans, and required the commission to submit the plans to this court for either approval or modification. Additionally, we noted that No. 6 tolerated ten percent deviation in district population size from the mean district size, while No. 9 only tolerated five percent deviation from the most populous to the least populous district size.

The senate interrogatory expressly asked us to determine whether the two amendments were in conflict. In answering the interrogatory, we stated that "we are fully mindful that it is our duty, whenever possible, to give effect to the expression of the will of the people contained in constitutional amendments adopted by them." *Id.* at 7, 536 P.2d at 313.

In evaluating the two proposed amendments, we noted that there were four possible results we could reach:

1. To declare Amendment No. 6 valid and Amendment No. 9 invalid.

2. To hold No. 9 valid and No. 6 invalid.

3. To adopt the position of the Attorney General and rule that both amendments are valid and can exist in harmony.

4. To rule that both amendments were validly adopted, but are so in conflict that each must fall.

*Id.* at 6–7, 536 P.2d at 313. We concluded that the provisions of No. 6 and No. 9 were in conflict, insofar as one forbade what the other permitted, and that the differences were irreconcilable. We found that section 1–40–113[3] required us to reach the conclusion that No. 9 should be given effect as it received the greatest popular support and thus represented "the predominant will of the people." *Id.* at 8, 536 P.2d at 314. In so concluding, we cited article V, section 1, of the Colorado Constitution, which provides in pertinent part that

The legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives, both to be elected by the people, but the people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly[.]

Our overriding concern in *In re House Bill 1078* was to "[e]nsure that the will of the people would be manifested." *Id.*

In the present case, I do not agree with the majority's observation that Amendment 1 and Amendment 8 are in implicit conflict. Maj. op. at 11. I conversely conclude that the express language of Amendments 1 and 8, considered against the backdrop of their accompanying ballot titles and against Article X of the Colorado Constitution generally, indicates that the limitation

---

**3.** Section 1–40–113, 1B C.R.S. (1973), provides as follows:

> **Counting of votes—conflicting provisions.** The votes on all measures submitted to the people shall be counted and properly entered after the votes for candidates for office cast at the same election are counted and shall be counted, canvassed, and returned and the result determined and certified in the manner provided by law concerning other elections. A majority of the votes cast thereon shall adopt any measure so submitted, and, in case of adoption of conflicting provisions, the one which receives the greatest number of affirmative votes shall prevail in all particulars as to which there is a conflict.

on state fiscal spending set forth in Amendment 1 does not encompass the lottery proceeds identified in Amendment 8.

## B.

### AMENDMENT 1

Amendment 1 appeared as a proposed constitutional amendment on the 1992 general election ballot. Its Ballot Title provided:

> An amendment to the Colorado Constitution to require voter-approval for certain state and local government tax revenue increases and debt; to restrict property, income, and other taxes; to limit the rate of increase in state and local government spending; to allow additional initiative and referendum elections; and to provide for the mailing of information to registered voters.

The Legislative Council of the Colorado General Assembly, in its analysis of the 1992 ballot proposals, summarized Amendment 1 in part as: (1) requiring approval of tax increases and debt; (2) limiting the growth in most state government spending; (3) limiting the annual rate of growth in property tax revenue; and (4) prohibiting certain taxes. The Legislative Council stated several of the arguments in favor of Amendment 1 as: (1) slowing the growth of government and preventing taxes from rising faster than the taxpayer's ability to pay; (2) government has not demonstrated that it can effectively and efficiently spend the tax revenue it receives; (3) the voters should be the ultimate authority on taxation; and (4) requiring refunds of excess tax collections forces government to be honest.

Titled "The Taxpayer's Bill of Rights," Amendment 1 was enacted at section 20 of Article X of the Colorado Constitution. Titled "Revenue," Article X of the Colorado Constitution concerns state and local government taxation. *See* Colo. Const. art. X, § 2 (requiring the General Assembly to provide for an annual tax to defray annual state expenses); § 3 (providing for uniform real and personal property taxation); § 10 (authorizing taxes upon corporations in this state); and § 17 (authorizing the imposition of income taxes). Enacted at section 20 of Article X, Amendment 1 states that its general goal is to "reasonably restrain most [of] the growth of government." Colo. Const. art. X, § 20(1). Amendment 1 accomplishes this goal through "spending limits" and "revenue limits." *Id.* at § 20(7), (8). Amendment 1 provides in relevant part:

(1) **General Provisions.** ... All provisions are self-executing and severable and supersede conflicting state constitutional, state statutory, charter, or other state or local provisions. Other limits on district revenue, spending, and debt may be weakened only by future voter approval....

(2) **Term Definitions.** ...

(b) "District" means the state or any local government, excluding enterprises.

. . . .

(d) "Enterprise" means a government-owned business authorized to issue its own revenue bonds and receiving under 10% of annual revenue in grants from all Colorado state and local governments combined.

(e) "Fiscal year spending" means all district expenditures and reserve increases except, as to both, those for refunds made in the current or next fiscal year or those from gifts, federal funds, collections for another government, pension contributions by employees and pension fund earnings, reserve transfers or expenditures, damage awards, or property sales.

. . . .

(4) **Required elections.** Starting November 4, 1992, districts must have voter approval in advance for: ... any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district.

. . . .

(6) **Emergency taxes.** This subsection grants no new taxing power. Emergency property taxes are prohibited.

(7) **Spending limits.** (a) The maximum annual percentage change in state fiscal year spending equals inflation plus the percentage change in state population in the prior calendar year, adjusted for revenue changes approved by voters after 1991. Population shall be determined by annual federal census estimates and such number shall be adjusted every decade to match the federal census.

. . . .

(d) If revenue from sources not excluded from fiscal year spending exceeds these limits in dollars for that fiscal year, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset. . . .

(8) **Revenue limits.** (a) New or increased transfer tax rates on real property are prohibited. No new state real property tax or local district income tax shall be imposed. Neither an income tax rate increase nor a new state definition of taxable income shall apply before the next tax year. Any income tax law change after July 1, 1992 shall also require all taxable net income to be taxed at one rate, excluding refund tax credits or voter-approved tax credits, with no added tax or surcharge.

### AMENDMENT 8

Like Amendment 1, Amendment 8 appeared as a proposed constitutional amendment on the 1992 general election ballot. Its Ballot Title provided:

An amendment to the Colorado Constitution to create the Great Outdoors Colorado Program; to provide for the permanent dedication of net proceeds from every state-supervised lottery game for the program after payment of certain existing obligations; to specify that the program provide for the preservation, protection, enhancement, and management of the state's wildlife, park, river, trail, and open space heritage; to establish a board as an independent political subdivision of the state to oversee the program; and to create a trust fund for the program.

The Legislative Council of the Colorado General Assembly, in its analysis of the 1992 ballot proposals, indicated that Colorado voters approved an amendment to the Colorado Constitution in 1980 which created a state-supervised lottery, and specified that net proceeds from the lottery would be allocated to the Conservation Trust Fund unless otherwise provided by statute. The General Assembly passed legislation in 1982 which allocated fifty percent of the lottery proceeds to the state Capital Construction Fund, forty percent to the trust fund, and ten percent to the Division of Parks and Wildlife. In 1988, the General Assembly changed the funding formula "to ensure that a sufficient amount of the net proceeds would be dedicated to pay for construction of new state prison facilities." The Legislative Council noted an argument in favor of Amendment 8 was to effectuate the original intent of the proponents of the lottery in 1980, "to dedicate all lottery proceeds to parks, outdoor recreation, and open space." The Legislative Council also noted that "[t]he initiative creates a new and autonomous board which is largely unaccountable to either the legislature or the Governor."

Titled the "Great Outdoors Colorado Program," Amendment 8 provides in pertinent part as follows:

Section 1. *Great Outdoors Colorado Program.* (1) The people of the State of Colorado intend that the net proceeds of every state-supervised lottery game operated under the authority of Article XVII, Section 2 shall be guaranteed and permanently dedicated to the preservation, protection, enhancement and management of the state's wildlife, park, river, trail and open space heritage, except as specifically provided in this article. Accordingly, there shall be established the Great Outdoors Colorado Program to preserve, protect, enhance and manage the state's wildlife, park, river, trail and open space heritage. . . .

. . . .

Section 2. *Trust Fund created.* A fund to be known as the Great Outdoors Colorado Trust Fund, referred to in this article as the "Trust Fund," is hereby

created and established in the Treasury of the State of Colorado.

Section 3. *Moneys allocated to Trust Fund.*

(1) Beginning with the proceeds from the fourth quarter of the State's Fiscal Year 1992–1993, all proceeds from all programs, including Lotto and every other state-supervised lottery game operated under the authority of Article XVIII, Section 2 of the Colorado Constitution, ... are set aside ... as follows:

(a) For each quarter through the fourth quarter of the State's Fiscal Year 1997–1998:

(I) to the Conservation Trust Fund and the Division of Parks and Outdoor Recreation in the amounts allocable thereto under statute as amended through January 1, 1992;

(II) to the State's Capital Construction Fund for payment of debt service due from and including September 1, 1993, to and including November 30, 1998, ...; and

(III) The State Treasurer shall deposit all remaining Net Proceeds, if any, in trust for the Board of the Trust Fund.

. . . .

Section 4. *Fund to remain inviolate.* All moneys deposited in the Trust Fund shall remain in trust for the purposes set forth in this article, and no part thereof shall be used or appropriated for any other purpose, nor made subject to any other tax, charge, fee or restriction.

. . . .

Section 6. *The State Board of the Great Outdoors Colorado Trust Fund.*

(1) There shall be established a State Board of the Great Outdoors Colorado Trust Fund....

. . . .

(3) ... [The Board's] organization, powers, revenues and expenses shall not be affected by any order or resolution of the general assembly, except as provided in this constitution. It shall not be an agency of state government, nor shall it be subject to administrative direction by any department, commission, board, bureau or agency of the state, except to the extent provided in this constitution.

C.

The precise question we are called on to answer asks us to determine whether any lottery proceeds identified in Amendment 8 are subject to Amendment 1. In answering this question, I follow the analytical process followed in *In re Interrogatories Propounded by the Senate Concerning House Bill 1078*, previously discussed. I reiterate that "it is our duty, whenever possible, to give effect to the expression of the will of the people contained in , constitutional amendments adopted by them." *In re House Bill 1078*, 189 Colo. at 7, 536 P.2d at 313.

In review, the plain language of Amendment 1 reveals that the constitutional amendment found in section 20 of article X is concerned primarily with requiring voter approval for any new tax, and with limiting government spending. Amendment 1 concerns government revenue, which is regulated generally in Article X of the Colorado Constitution. Article X concerns tax revenue, and does not govern lottery games and their proceeds. The language of Amendment 1 does not include proceeds from lottery games within its definition of "fiscal year spending." Additionally, the Conservation Trust Fund does not fit within the definitions of "district" and "enterprise" found in Amendment 1.

The plain language of Amendment 8 specifies that its purpose is to preserve and protect the state's wildlife and open space. The plain language creates a trust fund into which all proceeds from every state-supervised game will eventually be allocated. The trust fund is funded solely through lottery proceeds. In section 4 of Amendment 8, the proceeds deposited into the trust are "inviolate," and may only be expended to further the purposes of Amendment 8. The language of Amendment 8 does not contemplate taxes as a funding source. Amendment 8 additionally creates an independent board, not subject to statutory regulation by the general as-

sembly, which serves no other purpose than to administer the trust fund.

By enacting Amendment 8, the people of the State of Colorado expressed their will that all proceeds from state-supervised lottery games be permanently dedicated to the preservation, protection, enhancement, and management of the state's wildlife, park, river, trail, and open space heritage. When enacting Amendment 8, the people of the State of Colorado did not express a will that such proceeds should be treated similarly to other tax revenue which is incorporated into the state general fund and subject to appropriation by the General Assembly. The plain language of Amendment 8 mandates that the lottery proceeds are " 'custodial' in nature—funds not generated by tax revenues which are given to the state for particular purposes and of which the state is a custodian or trustee to carry out the purposes for which the sums have been provided." *Colorado General Assembly v. Lamm*, 700 P.2d 508, 524 (Colo. 1985) (relying on *Pensioners Protective Ass'n v. Davis*, 112 Colo. 535, 150 P.2d 974 (1944)). Contrary to the core of Amendment 1, the people did not express a will to limit the amount of funds expended on the protection and preservation of wildlife by enacting Amendment 8. *See* sec. 8 (stating that the people intend that the allocation of lottery proceeds be in addition to and not a substitute for funds appropriated by the General Assembly).

As evidenced by its ballot title, Amendment 1 requires voter approval for certain tax revenue increases and limits government spending. Amendment 8, as demonstrated by its ballot title, permanently dedicates net proceeds from state-supervised lottery games. *See In re Proposed Initiative Concerning Parental Notification of Abortions for Minors*, 794 P.2d 238, 240 (Colo.1990) (holding that the ballot title must fairly express the true intent and meaning of the proposed measure); *Bauch v. Anderson*, 178 Colo. 308, 497 P.2d 698 (1972) (noting that we presume that the Title Setting Review Board accurately expresses the true meaning and intent of proposed constitutional amendments in the ballot title).

Based on this analysis, I find that the will of the people as expressed in the 1992 election must be effectuated by concluding that the proceeds from state-supervised lottery games do not come within the ambit of Amendment 1's state fiscal year spending. A review of the plain language indicates that, unlike the amendments at issue in *In re House Bill 1078*, there is no literal overlap between Amendment 1 and Amendment 8. There is thus no need to investigate whether Amendment 1 conflicts with Amendment 8. By simultaneously enacting Amendments 1 and 8, the People did not intend that Amendment 1 would infringe upon Amendment 8. As such, I find that the amendments are mutually exclusive.

## II.

I do not agree with the majority that the two amendments are in implicit conflict. The majority is persuaded that implicit conflict exists because the General Assembly does not control the inflow of net lottery proceeds, and thus growth in net lottery proceeds might force a refund in order to comply with the spending limits of Amendment 1. This interpretation, however, and not the language of the amendments themselves, creates implicit conflict. Were I to endorse this interpretation, I would not find "that the General Assembly has reasonably resolved the implicit conflict." Maj. op. at 11. Rather, I would be constrained to find that Amendment 8, which received 876,424 votes, prevails over Amendment 1, which received 812,308 votes, under both section 1-40-113 and our duty to effectuate the will of the people. *See In re House Bill 1078*. I find, however, that to reach such conclusions invites this court to enter into the province of the General Assembly by legislating a judicially preferred result. I decline to do so. I additionally find that the result reached by the majority will invite future interrogatories requesting this court to carve out other exemptions of money sources from the purview of Amendment 1. This approach detracts from examining the plain lan-

guage of Amendment 8, which reflects the will of the voters.

### III.

The majority finds that the appropriate answer to interrogatory No. 5 is "No." While I agree that "No" is the appropriate response to interrogatory No. 5, I do not agree with the majority's analysis.

Interrogatory No. 5 states:

Can the General Assembly enact limitations on revenues collected by the limited gaming control commission, created in section 9(2) of article XVIII of the state constitution, in order to comply with the limitation on state fiscal year spending set forth in section 20(7)(a) of article X if the state constitution.

Enacted by the people on November 6, 1990, section 9 of Article XVIII (the limited gaming amendment) authorizes limited gaming in specified cities within Colorado. The limited gaming amendment provides for the creation of both a limited gaming fund and a limited gaming control commission (the commission). The limited gaming amendment gives the commission sole authority to administer and regulate limited gaming in Colorado. The limited gaming amendment also gives the commission the authority to set the percentage of adjusted gross proceeds to be paid by each licensee into the limited gaming fund annually. The limited gaming amendment expressly provides:

At the end of each state fiscal year, the state treasurer shall distribute the balance remaining in the limited gaming fund, except for an amount equal to all expenses of the administration of this section 9 for the preceding two-month period, according to the following guidelines: fifty percent shall be transferred to the state general fund or such other fund as the general assembly shall provide; twenty-eight percent shall be transferred to the state historical fund, which fund is hereby created in the state treasury; twelve percent shall be distributed to the governing bodies of Gilpin county and Teller county in proportion to the gaming revenues generated in each coun-

ty; the remaining ten percent shall be distributed to the governing bodies of the cities of: the City of Central, the City of Black Hawk, and the City of Cripple Creek in proportion to the gaming revenues generated in each respective city.

Colo. Const. art. XVIII, § 9(5)(b)(II).

Based on my analysis with respect to the answer to Interrogatory No. 2, I find that the plain language of the limited gaming amendment dictates that the answer to Interrogatory No. 5 is "No." Amendment 1 does not expressly include proceeds from limited gaming in its definition of "state fiscal year spending." I find it significant that Amendment 1 could have incorporated such funds by reference—since the limited gaming amendment was enacted in 1990 and went into effect on January 3, 1991—but did not.

Additionally, the limited gaming amendment does not classify proceeds from limited gaming as revenue. Like the lottery proceeds identified in Amendment 8, limited gaming proceeds are deposited into a separate fund and may only be expended according to the precise terms of subsection (5)(b)(II). I find that such funds are custodial in nature and not subject to the General Assembly's power of appropriation. Accordingly, the General Assembly cannot enact limitations on revenues collected by the limited gaming control commission.

Based on the foregoing, I dissent in part and concur in the result only as to Interrogatory No. 5.

I am authorized to say that Justice MULLARKEY joins in the dissent and concurrence in result only.

Justice MULLARKEY dissenting to Interrogatory No. 2 and concurring in the result only on Interrogatory No. 5:

This court has been asked to answer a number of interrogatories by the General Assembly regarding Senate Bill No. 93–74, and we agreed to answer Interrogatories No. 2 and No. 5. To Interrogatory No. 2, the majority gives an affirmative response, and to Interrogatory No. 5, the majority

gives a negative response. I join in Justice Vollack's dissent to the majority's position on Interrogatory No. 2, concerning lottery revenues and would answer that question "No." I also find that the response to Interrogatory No. 5 should be "No" and therefore concur with the result reached by the majority, but I write in order to emphasize my belief that gaming revenues are excluded from Amendment 1's coverage. Although the majority states at p. 13, n. 13 of its opinion that it assumes without deciding that limited gaming funds are subject to Amendment 1, its discussion at pp. 14–15 appears to affirmatively decide that issue. I do not join any such analysis.

Interrogatory No. 5 reads as follows:

Can the General Assembly enact limitations on revenues collected by the limited gaming control commission, created in section 9(2) of article XVIII of the state constitution [the "Limited Gaming Amendment"], in order to comply with the limitation on state fiscal year spending set forth in section 20(7)(a) of article X of the state constitution ["Amendment 1"]?

The voters of this state passed the Limited Gaming Amendment in 1990, thereby legalizing limited gambling in Central City, Black Hawk and Cripple Creek. Colo. Const. art. XVIII, § 9. This amendment provides for the creation of a "limited gaming control commission" (the "Commission"), which has as its duties the promulgation of rules and regulations governing the licensing of limited gambling, including the determination of the percentage of adjusted gross proceeds that must be paid annually by each licensee.[1] Adjusted gross proceeds are defined as the total amount of all wagers less payments to players, *i.e.*, net wagers. The percentage determination is made by the Commission using criteria set forth by the General Assembly. *Id.*

I agree with the majority that, under the plain meaning of the Limited Gaming Amendment language, only the Commission, and not the General Assembly, has the power to establish the percentages of net wagers to be paid. Amendment 1 provides no authority for the General Assembly to control the amount of money paid into the limited gaming fund. Justice Vollack's view of the lottery funds collected under Amendment 8 also seems equally applicable to the percentage of net wagers collected here, however. The limited gaming fund, like the lottery, is not within the limitations of Amendment 1. My position is supported by the fact that the pamphlet issued by the Legislative Council of the Colorado General Assembly analyzing the 1990 ballot proposals equates other forms of legalized gambling—pari-mutuel betting, the lottery, and bingo and raffles—with limited gaming in its discussion of the Limited Gaming Amendment.

In 1990, the voters of the state agreed to set aside the gaming revenues for certain specified purposes. The collected proceeds go into the limited gaming fund, are used to pay all ongoing expenses of the Commission and any other agency involved in the administration of this amendment, and payments are not subject to the control of the General Assembly. Colo. Const. art. XVIII, § 9(b)(I). The remainder of the pro-

---

1. The relevant portions of the Limited Gaming Amendment read as follows:

   (2) The administration and regulation of this section 9 shall be under an appointed limited gaming control commission, referred to in this section 9 as the commission; said commission to be created under such official or department of government of the state of Colorado as the general assembly shall provide by May 1, 1991.... The commission shall promulgate all necessary rules and regulations relating to the licensing of limited gaming by October 1, 1991

   . . . . .

   (5)(a) Up to a maximum of forty percent of the adjusted gross proceeds of limited gaming

shall be paid by each licensee, in addition to any applicable license fees, for the privilege of conducting limited gaming. Such percentage shall be established annually by the commission according to the criteria established by the general assembly in the implementing legislation to be enacted pursuant to paragraph (c) of this subsection (5). Such payments shall be made into a limited gaming fund that is hereby created in the state treasury.

   . . . . .

   (c) the general assembly shall enact, amend, or repeal such laws as are necessary to implement the provisions of this section 9, by May 1, 1991.

Colo. Const. art. XVIII, § 9.

ceeds are then distributed at the end of the fiscal year in the following manner:

> fifty percent shall be transferred to the state general fund or such other fund as the general assembly shall provide; twenty-eight percent shall be transferred to the state historical fund, which fund is hereby created in the state treasury; twelve percent shall be distributed to the governing bodies of Gilpin county and Teller county in proportion to the gaming revenues generated in each county; the remaining ten percent shall be distributed to the governing bodies of the cities of: the City of Central, the City of Black Hawk, and the City of Cripple Creek in proportion to the gaming revenues generated in each respective city.

Colo. Const. art. XVIII, § 9(5)(b)(II). Twenty percent of the moneys in the state historical fund are to be proportionately distributed among the three cities specified above, and the remaining eighty percent is to be used for preservation and restoration of historical sites around the state. Colo. Const. art. XVIII, § 9(5)(b)(III).

Following the analysis set forth in Justice Vollack's partial dissent, I note that Amendment 1 does not include gaming revenues within its definition of "fiscal year spending," nor does the Commission fit into the definitions of "district" or "enterprise" for the purposes of the amendment. The collected gaming revenues go into funds that were created solely for the purpose of holding these revenues, and the funds have certain specified purposes for which the moneys contained therein must be used. The Commission has discretion to set the percentage of net wagers to be collected. By enacting the Limited Gaming Amendment, the people of Colorado not only permitted gambling within the state, but also specified who would determine the amount of proceeds and how the proceeds from gaming were to be spent. Thus the funds may even be regarded as "custodial funds" given to the state for a particular purpose, which the state as custodian of the funds must carry out. *See Colorado General Assembly v. Lamm*, 700 P.2d 508, 524 (Colo.1985). Allowing the General Assembly to set a limit on the proceeds thereby contravenes the will of the people as expressed in the Limited Gaming Amendment and changes the nature of the funds.

It seems to me that given the history and purpose of the Limited Gaming Amendment, the amount or percentage of net wagers collected by the Commission cannot be set by the General Assembly. Therefore, I agree that the answer to Interrogatory No. 5 should be "No," and I concur with the result reached in the majority opinion.

I am authorized to say that Justice VOLLACK joins in this concurrence and dissent.