QUESTION No. 1: Could the Attorney General clarify the language in Formal Attorney General Opinion 93-8, which states that § 29-1-301, C.R.S., "does not conflict" with section 7(c) of art. X, § 20, Colo. Const., and that the statute is "incorporated into" the constitutional amendment?
ANSWER No. 1: TABOR preserved other limits on district revenue and spending which do not directly conflict with it. This office determined in Formal Attorney General Opinion 93-8 that § 29-1-301, C.R.S., does not directly conflict with TABOR. Therefore, this limit on annual levies by local governments continues in full force and effect as an additional limit on government revenue increases.
DISCUSSION No. 1: Section 29-1-301, C.R.S., limits the amount of property tax revenue that counties, municipalities and other local governments and districts described therein may levy. It requires that, if necessary, the government shall reduce its statutory tax levies to limit the annual increase in revenues from tax levies (with certain deductions and exclusions) to 5.5%.
Section 29-1-301(1.2) states that the 5.5% limit in §29-1-301 shall not apply to "capital expenditures" of counties, cities and towns. These taxing entities may retain tax revenue in excess of the 5.5% limit after notice, public hearing and a vote of two-thirds of the taxing entity board of governors. Section29-1-302(1) allows the Department of Local Affairs to waive a special district's 5.5% limit if the tax revenue otherwise raised would be insufficient for the needs of the special district in the current year. Section 29-1-302(1.5) allows special districts to hold an election or request an order from the Department of Local Affairs to exceed the 5.5% tax revenue limit to finance capital projects and purchase capital assets. If the Department does not timely approve the application, § 29-1-302(2) authorizes the special district to take the question to a vote of its electorate. Section 29-1-302(2)(c) allows cities and towns of less than 2000 population to utilize the procedures in § 302 as opposed to the notice and hearing provisions of § 301(1.2). Section 29-1-302(2)(b) allows any entity to take a question of exceeding the 5.5% revenue limit to its electors. As these exceptions to the 5.5% limit were in the law prior to TABOR's approval, they are not a post-TABOR weakening of the 5.5% limit, which would violate TABOR § 1.
TABOR § 1 states in part: "Other limits on district revenue, spending, and debt may be weakened only by future voter approval." (emphasis added). TABOR by its terms contemplates that other limits on government revenue, spending and debt, such as § 29-1-301, shall remain in effect. As there is no apparent conflict between the statute and TABOR, § 29-1-301
remains in force. TABOR § 7(c) sets districts' maximum percentage increase in property tax revenues. Section 29-1-301
sets a separate limit in the percentage increase in tax revenue. Hence, even if a TABOR calculation would allow a 10% overall increase in district property tax revenues, a district could only retain tax revenues up to 5.5% over the previous year's tax revenues to fund the increase, except as provided in §§29-1-301 302. Likewise, if retention of the entire 5.5% tax revenue increase causes a district to exceed its TABOR property tax revenue limit, the district could not retain property tax revenue in excess of the TABOR spending limit without voter approval.
Further, statutory and constitutional provisions should, if possible, be interpreted in such a manner as to harmonize them and avoid conflict. See In re. Submission of Interrogatories onSenate Bill 93-74, 852 P.2d 1 (Colo. 1993). TABOR § 7 and § 29-1-301, C.R.S., can be harmonized by viewing them as set forth above.
QUESTION No. 2: Is there specific language which local governments must use in ballot questions when seeking voter approval for "increased levies" under § 29-1-302, C.R.S., especially when combining such a question with a TABOR ballot issue?
ANSWER No. 2: The answer to this question turns on the different definitions of "increased levy" under TABOR and §29-1-301, C.R.S.
DISCUSSION No. 2: TABOR § 4 requires an election to approve "any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district." If a district wishes to conduct such an election, TABOR § 3(c) provides that certain language be used in the ballot title.
The Division of Local Government interprets "increased levy" in the context of §§ 29-1-301 and 302, C.R.S., to mean: If the current mill levy produces more tax revenue than the 5.5% annual increase allowed under § 29-1-301, the mill levy has beenincreased. The Division reasons that the law requires local districts to set annual mill levies. These levies must comply with the 5.5% annual tax revenue increase limit in §29-1-301, or the district must refund the excess. Thus, a district may be deemed by the Division to have increased its mill levy without the actual levy being greater (and perhaps being less) than the mill levy for the prior year.
The question thus becomes: Does the Division of Local Government's interpretation of the term "mill levy increase" as used in § 29-1-301 apply in determining whether a TABOR election is required? The answer is no, assuming that the retention of the increased tax revenues does not violate the revenue limit in TABOR § 7(c). TABOR utilizes the concept of tax or mill levy increase to refer to an increase over the prior year's rate. Ordinarily these require a TABOR election. Fluctuations in tax revenues, however, are a separate concept and do not trigger an election unless the limit in TABOR § 7(c) is exceeded.
TABOR § 4 requires a TABOR election for "any mill levyabove that for the prior year" (emphasis added). If the local district has not set a mill levy at a rate above that for the prior year, but the mill levy results in tax revenues in excess of the 5.5% increase allowed in § 29-1-301, the district need not comply with TABOR's election provisions and either the approval provisions in §§ 29-1-301(1.2) and 302(1.5) or the election provisions in §§ 29-1-302(1) or (2) control.[1]
 QUESTION No. 3: Do all actions which increase the property tax revenues of local districts have to be addressed in ballot issues, with none able to be accomplished administratively under the 5.5% property tax revenue limit in the absence of an election?
ANSWER No. 3: No. As long as the increase in property tax revenues does not involve an increase in the mill rate above the prior year's rate, or violate some other provision of TABOR, the Department may employ the procedures in §§ 29-1-301(1)(b) 
(1.2) and 302(1) (1.5), which may result in a property tax revenue increase.
DISCUSSION No. 3: As noted in the discussion of Question 2, above, a local district may utilize the procedures described in discussion no. 1, above, to maintain its prior year's mill levy rate without holding a TABOR election as long as it complies with the provisions of § 29-1-301 and 302, C.R.S. Also, §29-1-301(1)(b), C.R.S., allows local districts to apply for approval of certain exclusions from the computation of the 5.5% limit. As this exclusion is solely for the purpose of calculating the 5.5% increase under § 29-1-301, no provision of TABOR is implicated. Similarly, § 29-1-301(2), C.R.S., allows local districts to obtain yearly approval of the levying of tax revenues in excess of the 5.5% annual increase either by approval of the Division of Local Government or by a vote of its electors. As long as no TABOR limit is exceeded, these dual approval procedures are allowed and no TABOR election need be held.[2]
 QUESTION No. 4: May the Division of Local Government order a temporary property tax credit to accomplish a mill levy reduction required by § 29-1-301(6), C.R.S.?
ANSWER No. 4: It is unclear whether the Division may order a particular remedy to accomplish the mill levy reduction required by § 29-1-301(6), C.R.S. Even if the Division cannot order local taxing entities to use a particular method for accomplishing the mill levy reduction, nothing in TABOR appears to restrict the local districts' discretion with respect to accomplishing the intent of part 3, article 1, title 29, C.R.S.
DISCUSSION No. 4: Section 29-1-301(6), C.R.S. states:
 Where a taxing entity exceeds the limitation imposed by subsection (1) of this section during any year, the division of local government shall order a reduction in the authorized revenue of the taxing entity for the subsequent year in an amount which offsets the excess revenue levied in the preceding year. Such order shall be preceded by notice to the taxing entity of the proposed order and an opportunity for the taxing entity to respond prior to issuance of the order.
The statute does not specify how this reduction should be accomplished. This lack of specific remedy contrasts with the provisions of art. X, § 3(1)(c)(III), Colo. Const., and §39-1-105.5(1)(b)(III), C.R.S. These laws grant the State Board of Equalization the power to order a specific remedy (an additional property tax on all taxable property within the county) if it is determined that the state made excess equalization payments to a school district within the county. It is possible that a taxing entity could have other sources of revenue, in which case there seems to be no statutory prohibition against the taxing entity reducing this other revenue source to comply with an order under § 29-1-301(6). Additionally, the Division has not been granted specific rulemaking authority on this question, which suggests that taxing entities are free to choose their own method of accomplishing the reduction, as long as they comply with the Division's order to reduce revenue.
TABOR and associated legislation suggest that a temporary property tax credit is an appropriate method for carrying out an ordered rate reduction. Section 39-1-111.5(1), C.R.S., states:
 In order to effect a refund for any of the purposes set forth in section 20 of article X of the state constitution, any local government may approve and certify a temporary property tax credit or temporary mill levy rate reduction as set forth in this section. The procedures set forth in this section shall be deemed to be a reasonable method for effecting refunds in accordance with section 20 or article X of the state constitution.
Section 39-1-111.5(1) applies only to refunds under TABOR. However, both TABOR and part 3, article 1, title 29, C.R.S., set limits on government revenue and the use of the same refund procedures is reasonable and not inconsistent with any existing law.
TABOR § 20(1) provides for temporary tax credits and rate reductions to refund revenue in excess of TABOR's limits. A district's use of a temporary mill levy rate reduction to refund revenues in excess of the 5.5% limit in § 29-1-301
should not create a TABOR violation when the district's mill levy is subsequently reset. TABOR specifies penalties for illegally keeping excess revenues (payment of 10% annual simple interest, plus costs and attorneys fees to successful plaintiffs). Permanent tax rate or mill levy reductions are not listed among these penalties. TABOR does not impose any additional penalties on a district for receiving revenues in excess of another statutory or constitutional limit.
QUESTION No. 5: May local taxing jurisdictions still hold elections under § 29-1-302, C.R.S., for:
 a. An "increased levy" as defined by the Division of Local Government (see discussion no. 2, paragraph 2, above)?
 b. An increase in revenue for a one-time, nonrecurring expenditure (e.g., for capital construction), which may continue for more than one year?
 ANSWER No. 5: a. Special districts and cities and towns of less than 2000 population may use the election provisions of § 29-1-302(1), C.R.S., to retain an "increased levy" for general operating purposes for one year if no TABOR tax, revenueor spending limit is violated.
Special districts and cities and towns of less than 2000 population may also use the election provisions of §29-1-302(1.5) to retain an "increased levy" to finance capital projects and purchases of capital assets which are one-time, nonrecurring expenditures.
b. Counties and cities and towns of over 2000 may use the procedures in § 29-1-301(1.2) to retain an "increased levy" for "capital expenditures" as defined therein for a fixed number of years if no TABOR tax, revenue or spending limit is violated.
c. Notwithstanding their statutory authority to retain an "increased levy", local districts may not enter into multiple fiscal year obligations without complying with TABOR § 4(b)'s election requirement.
d. Pursuant to § 29-1-301(1)(b), C.R.S., any taxing entity subject to § 29-1-301's 5.5% revenue limit may apply to the Division of Local Government to exempt all or a portion of the increased valuation for assessment attributable to new primary oil or gas production for the preceding year from the 5.5% revenue increase limit if the leasehold or land is wholly or partially within the taxing entity and if such new primary oil or gas production has caused or will cause an increase in the level of services provided by the taxing entity. Pursuant to § 29-1-302(2)(b), if the Division of Local Government does not approve an application to exempt the increased valuation for assessment attributable to new primary oil and gas production for the preceding year from the 5.5% limit, or it the taxing entity chooses to bypass the Division, they may submit this question to a vote of its electors. If no TABOR limit will be violated by this process, no TABOR election is necessary.
DISCUSSION No. 5: a. As discussed in No. 2, above, the Department of Local Affairs interpretation of the term "increased levy" in § 29-1-301 differs from the definition of the terms "tax rate increase" and "mill levy above that for the prior year" in TABOR § 4(a). The Department uses "increased levy" to mean any rate of taxation which will result in a tax revenue increase in excess of § 29-1-301's 5.5% limit. So long as the mill levy rate is not actually increased over the prior year's mill levy rate, and TABOR's revenue and spending limits are not violated, TABOR is not implicated.
Pursuant to § 29-1-302(1), the Division of Local Government may approve an application by a special district to retain the "increased levy" for one year for any purpose. Pursuant to § 29-1-302(1.5), the Division of Local Government may approve an application by a special district to retain an "increased levy" for one time, nonrecurring capital projects and the purchase of capital assets. The "increased levy" for capital projects or to purchase capital assets shall not be used to determine a special district's 5.5% limitation for the following year. Section 29-1-302(2)(c) makes the provisions of §29-1-302(1) and (1.5) applicable to cities and towns of less than 2000 population. Pursuant to § 29-1-302(2)(a), if the Division of Local Government denies a request under §29-1-302(1) or (1.5) to retain an "increased levy", the taxing entity may submit the question to a vote of its electorate.
This process does not constitute a weakening of §29-1-301's revenue limit. These waivers and election provisions were part of the statute pre-TABOR and do not violate TABOR if this increased revenue does not exceed the local district's TABOR § 7(c) limit.
b. Section 29-1-301 does not contain a provision analogous to § 29-1-302(1), which allows special districts and cities and towns of less than 2000 to retain an "increased levy" for any purpose for one year. Section 29-1-301(1.2) speaks only to "increased levies" for "capital expenditures". Counties and cities and towns of more than 2000 may exceed the 5.5% limit for capital expenditures without Division of Local Government approval by following the notice and hearing procedures in §29-1-301(1.2)(c). Counties and cities and towns of more than 2000 population may exceed the 5.5% limit for capital expenditures without either the Division of Local Government's approval or an election, as long as the district's TABOR § 7(c) limit is not violated.
c. An "increased levy" as defined by the Division of Local Government to fund a multi-year capital construction project would violate TABOR if the local district has entered into a multiple year fiscal obligation without adequate present cash reserves or voter approval in a TABOR election.
d. Section 29-1-302(2)(b) allows any taxing entity to which section 29-1-301(1) applies to submit the question of an increased levy directly to its electors without first submitting the question to the Division of Local Government. Section29-1-301(1) contains only one issue which is submitted to the Division of Local Government: the exclusion from the 5.5% limit of all or a portion of the increased valuation for assessment attributable to new primary oil or gas production for the proceeding year. Section 29-1-302(2)(b) does not authorize a vote to exceed the 5.5% limit for any purpose. Rather, it allows taxing entities to bypass the Division of Local Government when excluding the valuation for assessment of new oil and gas properties when calculating the 5.5% limit.
QUESTION No. 6: May § 29-1-301, C.R.S.'s 5.5% tax revenue increase limit be waived by a local election?
ANSWER No. 6: A district may not vote to eliminate the 5.5% tax revenue limit unless it is first granted the authority for such a local vote by the general assembly.
DISCUSSION No. 6: TABOR § 1 created a new requirement for weakening non-TABOR revenue limits. It states that: "Other limits on district revenue, spending and debt may be weakened only by future voter approval." Thus, § 29-1-301's 5.5% tax revenue increase limit may be weakened or eliminated only upon voter approval. The question becomes: what is the appropriate electorate to weaken a state statute limiting district revenue, spending and debt?
The most straight forward approach would be to submit any weakening amendment to a vote of the entire statewide electorate. A statewide vote is obviously well-suited to amending a state statute.
Alternatively, the general assembly can address this issue as it did a similar issue in 1995, when it enacted the Voter Approval for Weakening of Debt Limitations on School Districts Act, article 41.5, title 22, C.R.S. In the Act, the legislature determined that the appropriate electorate to vote on the weakening a statewide limit on school district indebtedness is the voters of the school district seeking to increase the debt limit. The legislature declared in §§ 22-41.5-101(1)(f) (g):
 No change in school district debt occurs by virtue of statutory changes that increase a limit when the debt would not actually increase without school district voter approval and any actual weakening occurs only when school district voter approval is obtained under an increased limit.
 By requiring voters to give approval at the school district level for any weakening of a school district limit on debt, the voter approval requirement of section 20(1) of article X [TABOR] is satisfied in a manner achieving a reasonable result through legislative harmonization of constitutional provisions.
The legislature stated in § 22-41.5-102(1):
 Whenever any provision of this title imposes a limitation on the debt of school districts and the voters of a school district are required by law to approve any change in debt subject to the limitation, the general assembly shall not be required to seek statewide voter approval to amend the statutory provision that imposes the limitation.
The general assembly may enact legislation which implements and executes TABOR, as well as legislation which resolves ambiguities in TABOR, and its construction of TABOR made shortly after its adoption is given great weight. Zaner v. City ofBrighton, 917 P.2d 280, 286 (Colo. 1996).
TABOR is not specific with respect to what is the appropriate electorate to vote on weakening a statewide revenue or debt limit if the weakened limit will only affect voters in a particular district. The procedure adopted by legislature in the title 22, article 41.5 is a reasonable construction of TABOR. It preserves the general assembly's authority with respect to setting limits on revenue and debt, while providing for a TABOR election by the affected electorate prior to a weakening of the limit.
Prior to a vote by a local district's electorate weakening or eliminating the 5.5% limit in § 29-1-301, the general assembly must pass a law similar to title 22, article 41.5. Thereafter, local districts could vote to waive or eliminate the 5.5% tax revenue limit.
SUMMARY
1. Section 29-1-301, C.R.S., sets a limit on the annual percentage increase in district property tax revenues. This limit was saved under the Taxpayers Bill of Rights and does not conflict with TABOR § 7(c). Districts must comply with both TABOR's and the statute's revenue limits. Pre-TABOR exceptions to the 5.5% limit and the procedures for using these exceptions remain valid if no TABOR limit is violated by their use.
2. Local districts are not required to use the ballot language in TABOR § 3(c) for elections involving questions arising solely under part 3, article 1, title 29, C.R.S. If TABOR limitations are affected, TABOR § 3(c) governs the election.
3. If no TABOR limit is violated, districts and the Division of Local Government may use the procedures in §§ 29-1-301 and 302 to alter the calculation of the 5.5% annual net tax revenue increase. As noted in footnote 1, use of the procedures in §29-1-301 or 302 to increase a district's mill levy rate over
that for the prior year would violate TABOR §§ 1 and 4. In such a case a TABOR election is necessary.
4. It is unclear whether the Division of Local Government has the discretion to order a taxing entity to grant temporary property tax credits or a temporary mill levy rate reduction in order to comply with the provisions of § 29-1-301, C.R.S. Whether the Division has this authority, or whether the choice of refund mechanism is left solely to the discretion of the taxing entity, temporary property tax credits or a temporary mill levy rate reduction are valid methods of carrying out the refund provisions of § 29-1-301(6), C.R.S.
5. Local districts may use the provisions of §§ 29-1-301
and 302, C.R.S., to retain an "increased levy" as defined by the Division of Local Government for the purposes specified and in the manner provided in those statutes without a TABOR electionif no TABOR tax, revenue or spending limit is violated. All taxing entities subject to the 5.5% limit in § 29-1-301(1) may either seek approval from the Division of Local Government or hold an election to exempt new primary oil and gas producing properties from the 5.5% limit. Counties and cities and towns in excess of 2000 population may exempt capital construction from the 5.5% limit through a notice and hearing process. Special districts and cities and towns of less than 2000 population may seek to retain revenues in excess of the 5.5% limit for any purpose for one year or for capital projects and capital purchases for one or more years through application to the Division of Local Government. If the Division denies the application, the special district or small city or town may seek approval from its electors to exceed the 5.5% limit for the purposes described above. Taxing entities may not enter into multiple fiscal year obligations under § 29-1-302(1.5) without complying with TABOR § 4.
6. Except as specifically provided in §§ 29-1-301 and 302, local districts may not hold elections to waive §29-1-301's 5.5% annual tax revenue increase limit prior to enactment of legislation similar to title 22, article 41.5, C.R.S., authorizing a local district to vote on weakening a state wide revenue or debt limit.
Sincerely,
GALE A. NORTON Attorney General
MERRILL SHIELDS Deputy Attorney General
STEPHEN G. SMITH Assistant Attorney General
[1] While not asked, the Attorney General believes it is appropriate to note that As discussed in Question No. 1, above, under certain circumstances, local governments may levy taxes in excess of the 5.5% limit. However, §§ 29-1-301(1.2) and29-1-302(1), (1.5) and (2), C.R.S., may conflict with TABOR to the extent they would allow a local district to increase a mill levy rate above that for the prior year to finance either general operations or capital expenditures. These sections allow an actual The exceptions in these statutes mill levy increase above the prior year's mill levy without a vote go under certain circumstances which go beyond the exceptions allowed in TABOR § (1) for a mill levy in excess of that for the prior year ((annual district revenue is less than annual payments on general obligation bonds, pensionspernsions and final court judgments). As TABOR is a constitutional amendment, in the case of an actual conflict which cannot be resolved, TABOR controls.
[2] TABOR § 1 prohibits any weakening of other limits on district revenue, spending and debt without voter approval. In this case, applying the provisions of § 29-1-301 and 302 to modify the 5.5% tax revenue increase calculation is not aweakening of the limit, as the statute contained this provision prior to TABOR. There have been two post-TABOR amendments to § 29-1-301, however, neither amendment appears to weaken the revenue limits of the statute.